ORIGINAL

1  KEKER, VAN NEST & PETERS LLP
   ELLIOT R. PETERS - #158708
2  epeters@keker.com
   LAURIE C. MIMS - #241584
3  lmims@keker.com
   STEVEN P. RAGLAND - #221076
4  sragland@keker.com
   CODY S. HARRIS - #255302
5  charris@keker.com
   ELIZABETH K. McCLOSKEY - #268184
6  emccloskey@keker.com
   633 Battery Street
7  San Francisco, CA 94111-1809
   Telephone:   415 391 5400
8  Facsimile:   415 397 7188

9  Attorneys for
   GENENTECH, INC.
10

FILED

OCT 3 0 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

11                   UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13  UNITED STATES OF AMERICA,                  Case No. CR-18-527-WHA

14            Plaintiff,                        **DECLARATION OF STEVEN P.
                                                RAGLAND IN SUPPORT OF
15       v.                                     GENENTECH, INC.'S ADMINISTRATIVE
                                                MOTION TO RELATE CASES**
16  XANTHE LAM,
    ALLEN LAM,                                  Judge:     Hon. William Alsup
17  JOHN CHAN and
    JAMES QUACH,                                Date Filed: October 25, 2018
18
              Defendants.
19

20  GENENTECH, INC.,
                                                Case No. 3:18-cv-06582-LB
21            Plaintiff,
                                                Judge: Magistrate Judge Laurel Beeler
22       v.
                                                Date Filed:     October 29, 2018
23  JHL BIOTECH, INC., XANTHE LAM, an
    individual, ALLEN LAM, an individual,
24  JAMES QUACH, an individual, RACHO
    JORDANOV, an individual, ROSE LIN, an
25  individual, JOHN CHAN, an individual, and
    DOES1-50,
26
              Defendants.
27

28

DECLARATION OF STEVEN P. RAGLAND IN SUPPORT OF GENENTECH, INC.'S
ADMINISTRATIVE MOTION TO RELATE CASES
CASE NO. CR-18-527-WHA

1308132.v1

I, STEVEN P. RAGLAND, declare:

1.      I am an attorney duly licensed to practice law in the State of California and am a member of the law firm Keker, Van Nest & Peters LLP, counsel for Plaintiff Genentech, Inc. in *Genentech, Inc. v. JHL Biotech, Inc., et al.*, Action No. 3:18-cv-06582-LB. The information in this declaration is based on my own personal knowledge and if called upon to testify, I could and would competently testify thereto.

2.      I make this declaration in support of Genentech's Administrative Motion to Consider Whether Cases Should be Related, pursuant to Civil Local Rule 3-12.

3.      On October 25, 2018, the U.S. Attorney's Office filed this case against Xanthe Lam, Allen Lam, James Quach, and John Chan. Following the unsealing of the indictment, Genentech filed the civil lawsuit, *Genentech, Inc. v. JHL Biotech, Inc., et al.*, Action No. 3:18-cv-06582-LB, against the same individuals who are defendants in this case, along with additional civil defendants that Genentech's complaint alleges worked with those defendants and benefited from the misappropriated trade secrets at issue in both cases. In sum, Genentech's civil case is based on substantially the same events that are at issue in the criminal matter. A copy of the Complaint filed in the civil suit is attached hereto as Exhibit A.

4.      In an effort to determine who represents the defendants in the civil suit and attempt to reach a stipulation with regard to relating the cases, counsel for Genentech contacted defense counsel in the criminal action, along with counsel known to represent each of the additional parties in the civil case in other matters. At the time of this filing, no civil defense counsel has been identified for any of the Defendants in *Genentech, Inc. v. JHL Biotech, Inc., et al.*, Action No. 3:18-cv-06582-LB. Accordingly, I could not contact them to ask whether they would stipulate to relating the civil and criminal cases. However, we will deliver a copy of this motion to defense counsel in the criminal action, and on counsel known to represent the additional parties in the civil case in other matters.

1

DECLARATION OF STEVEN P. RAGLAND IN SUPPORT OF GENENTECH, INC.'S
ADMINISTRATIVE MOTION TO RELATE CASES
CASE NO. CR-18-527-WHA

1308132.v1

1       I declare under penalty of perjury under the laws of the State of California that the

2   foregoing is true and correct, and that this declaration was executed on October 30, 2018, in

3   San Francisco, California.

4

5                              STEVEN P. RAGLAND

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

DECLARATION OF STEVEN P. RAGLAND IN SUPPORT OF GENENTECH, INC.'S
ADMINISTRATIVE MOTION TO RELATE CASES
CASE NO. CR-18-527-WHA

1308132.v1

PROOF OF SERVICE

I am employed in the City and County of San Francisco, State of California in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of eighteen years and not a party to the within action. My business address is Keker, Van Nest & Peters LLP, 633 Battery Street, San Francisco, CA 94111-1809.

On October 30, 2018, I served the following document(s):

**DECLARATION OF STEVEN P. RAGLAND IN SUPPORT OF GENENTECH, INC.'S ADMINISTRATIVE MOTION TO RELATE CASES**

☑ by regular **UNITED STATES MAIL** by placing a copy in a sealed envelope addressed as shown below. I am readily familiar with the practice of Keker, Van Nest & Peters LLP for collection and processing of correspondence for mailing. According to that practice, items are deposited with the United States Postal Service at San Francisco, California on that same day with postage thereon fully prepaid. I am aware that, on motion of the party served, service is presumed invalid if the postal cancellation date or the postage meter date is more than one day after the date of deposit for mailing stated in this affidavit.

Michelle J. Kane
U.S. Attorney's Office
1301 Clay Street, Suite 340S
Oakland, CA 94612

Matthew A. Parrella
U.S. Attorney's Office
150 Almaden Blvd., Suite 900
San Jose, CA 95113

William Lathan Osterhoudt
Law Office of William L. Osterhoudt
135 Belvedere Street
San Francisco, CA 94117
Attorney for Defendant XANTHE LAM

John Michael Runfola
Law Office of John M. Runfola
Pier 9, Suite 100
San Francisco, CA 94111
Attorney for Defendant JOHN CHAN

Michael Stepanian
Law Offices of Michael Stepanian
819 Eddy Street
San Francisco, CA 94109
Attorney for Defendant ALLEN LAM

Executed on October 30, 2018, at San Francisco, California.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

_____
ROSEANN CIRELLI

1

1308139.01

1  KEKER, VAN NEST & PETERS LLP
   ELLIOT R. PETERS - #158708
2  epeters@keker.com
   LAURIE CARR MIMS - #241584
3  lmims@keker.com
   CODY S. HARRIS - #255302
4  charris@keker.com
   ELIZABETH K. MCCLOSKEY - #268184
5  emccloskey@keker.com
   633 Battery Street
6  San Francisco, CA 94111-1809
   Telephone:   415 391 5400
7  Facsimile:    415 397 7188

8  Attorneys for Plaintiff Genentech, Inc.

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11  GENENTECH, INC.,                         Case No.

12              Plaintiff,                   **COMPLAINT FOR:**

13         v.                                1.  MISAPPROPRIATION OF TRADE
                                                 SECRETS IN VIOLATION OF 18 U.S.C.
14  JHL BIOTECH, INC., XANTHE LAM, an            § 1836 *et seq.*
    individual, ALLEN LAM, an individual,
15  JAMES QUACH, an individual, RACHO       2.  MISAPPROPRIATION OF TRADE
    JORDANOV, an individual, ROSE LIN, an       SECRETS IN VIOLATION OF CAL.
16  individual, JOHN CHAN, an individual,        CIV. CODE § 3426 *et seq.*
    and DOES 1-50,
17                                           3.  CONSPIRACY TO MISAPPROPRIATE
                Defendants.                      TRADE SECRETS
18
                                             4.  BREACH OF WRITTEN CONTRACT
19
                                             5.  INTENTIONAL INTERFERENCE WITH
20                                               CONTRACTUAL RELATIONS
21
                                             6.  BREACH OF DUTY OF LOYALTY
22
                                             7.  AIDING AND ABETTING BREACH OF
23                                               DUTY OF LOYALTY
24
                                             8.  VIOLATION OF COMPUTER FRAUD
25                                               AND ABUSE ACT, 18 U.S.C. § 1030
26
                                             9.  CONSPIRACY TO VIOLATE THE
27                                               COMPUTER FRAUD AND ABUSE ACT
28
                                             10. VIOLATION OF THE CALIFORNIA

                                    1
                                COMPLAINT
                                Case No.



COMPUTER DATA ACCESS AND
FRAUD ACT, CAL. PENAL CODE
§ 502

**DEMAND FOR JURY TRIAL**

Plaintiff Genentech, Inc. ("Genentech") alleges as follows:

## I.  INTRODUCTION

1.    This lawsuit concerns the brazen theft of trade secrets from Genentech, Inc., a global leader in biopharmaceutical research, development, and manufacturing, to benefit JHL Biotech, Inc. ("JHL"), a biotech company whose primary focus is on developing and marketing "biosimilar" versions of Genentech's innovative medicines.

2.    Documentary evidence, including emails, text messages, Skype logs, audit records, and other documents—as well as admissions from two of the named defendants—all make clear that former Genentech employees and others at JHL conspired to give JHL an illegal and corrupt advantage in the biotechnology industry by stealing Genentech's trade secrets and other confidential and proprietary information relating to Genentech's medicines and manufacturing processes.

3.    The United States Government has indicted three former Genentech employees—Xanthe Lam, Ph.D., Allen Lam[1], and James Quach—for criminal trade secret theft stemming from the conduct alleged in this complaint.  The government has also indicted John Chan, a former JHL formulation scientist who worked closely with Xanthe Lam on JHL's biosimilar development program.  Although criminal sanctions are warranted, this lawsuit seeks injunctive relief and civil damages from JHL and the individuals who conspired to steal Genentech's trade secrets.

---

[1] Because Defendants Xanthe Lam, Ph.D. and Allen Lam share the same last name, they are referred to in this Complaint as "Xanthe" and "Allen" respectively.

4.      JHL's theft was extensive and the stolen trade secrets concern some of the most critical facets of Genentech's business, including Genentech's proprietary, FDA-approved analytical methods, formulation know-how, quality acceptance criteria, and manufacturing protocols and procedures for establishing and maintaining safe, sterile manufacturing facilities and equipment.  Each stolen trade secret, standing alone, represents Genentech's hard work and investment, and would aid a competitor looking for a shortcut to developing and marketing its own rival medicine.  Taken together as a compilation, the stolen information provides a roadmap for JHL to produce biosimilar versions of Genentech's medicines, thereby achieving through theft what Genentech accomplished through diligence, trial-and-error, hard-won know-how, and significant investment of time and money.

5.      These trade secrets—many of which are embodied in documents that Defendants secretly downloaded from Genentech's secure electronic document repositories over several years—are highly confidential and closely guarded from public disclosure.

6.      The stolen trade secrets are extremely valuable, and have already yielded tangible results for JHL as it seeks to compete in the rapidly growing biosimilar industry.  Bringing a biopharmaceutical medicine—even a biosimilar version—through the complex cell culture-manufacturing process to the patient is a long, laborious, and costly process.  By stealing Genentech's trade secrets, JHL has dramatically accelerated its progress on the development of competing drugs, providing it with an unfair advantage not only vis-à-vis Genentech, but also with respect to other biosimilar manufacturers who are playing by the rules and competing lawfully.

7.      Genentech understands that, as a world leader in biopharmaceutical research, development, and manufacturing, it faces competition from many different companies worldwide.  When that competition is fair and legal, Genentech welcomes it—honest competition pushes the industry to strive for excellence and can lead to more treatment options for patients.   But while developing, manufacturing, and marketing biosimilars and other competing biologic therapies is lawful, doing so with stolen know-how is clearly not.

8.      JHL's founders—Racho Jordanov and Rose Lin—are former Genentech

employees, and Jordanov touts the presence of numerous Genentech alumni in JHL's workforce as a strategic advantage for his company. In seeking to loot Genentech's trade secrets, Jordanov, Lin, and JHL found willing accomplices in Xanthe Lam and her husband, Allen Lam.

9. Xanthe's participation in the scheme to steal Genentech's trade secrets occurred while she was a Genentech employee. As a senior scientist with more than 30 years of experience at Genentech, Xanthe was entrusted with access to some of Genentech's most precious and closely guarded intellectual property. Her work touched on many of the medicines Genentech has discovered and developed, including Pulmozyme®, Rituxan®, Herceptin®, Avastin®, and Tecentriq®. Xanthe's senior role gave her access to Genentech's secure document repositories, and an array of other files and information that Genentech keeps secret in order to protect their value.

10. Xanthe was bound by Genentech's Code of Conduct, which expressly prohibited her from disclosing Genentech's confidential and proprietary information, and from consulting for other biotech companies while she was a Genentech employee. Xanthe had also signed Genentech's Proprietary Information Agreement, which required her to guard Genentech's confidential, proprietary, and trade secret information from improper disclosure to competitors and third parties not authorized to receive it.

11. Xanthe betrayed Genentech's trust—as well as her contractual obligations and fiduciary duties—by providing JHL with Genentech's confidential and proprietary information, including trade secret information that Genentech guards so carefully.

12. JHL's unlawful scheme commenced in 2013, when JHL founders Racho Jordanov and Rose Lin solicited Xanthe and her husband to help JHL develop biosimilar versions of four Genentech medicines: Rituxan®, Pulmozyme®, Herceptin®, and Avastin®. Allen Lam agreed to serve as a consultant for JHL in exchange for fees as well as founder stock options corresponding to tens of thousands of shares in the startup, and Xanthe began surreptitiously working directly for JHL, while still serving as Principal Scientist at Genentech.

13. From 2013 through the fall of 2017 (when Genentech fired Xanthe for the misconduct described in this Complaint), the Lams provided JHL with confidential, proprietary,

and trade secret information from Genentech, at the behest of Jordanov and Lin, that helped

accelerate JHL's development of biosimilar versions of Genentech medicines.

14.     During the spring of 2017, the conspiracy to steal Genentech's trade secrets

expanded to include Defendant and former-Genentech employee James Quach, whom Genentech

fired in April 2017 for performance-related reasons.  Xanthe helped recruit Quach to JHL.

15.     Thereafter, on three separate occasions in July 2017, Xanthe improperly granted

Quach unrestricted and unauthorized access to Genentech's password-protected network. Quach

used that access to download hundreds of confidential manufacturing protocols and procedures

from Genentech's secure document repository system.  He saved those electronic documents to

an external storage device, and then took them with him to start a new job at JHL's

manufacturing plant in China.

16.     The trade secret information stolen by the Defendants to benefit JHL included

Genentech's validated proprietary analytical methods to test and ensure the stability, potency,

purity, chemical composition and identity, and quality of its Pulmozyme®, Rituxan®, Avastin®,

and Herceptin® medicines, and Genentech's proprietary information regarding the development

and selection of a formulation for those four medicines. Through the Lams and Quach, JHL also

misappropriated Genentech's proprietary protocols and systems for quality risk management;

environmental control in its manufacturing facilities; calibration, validation and maintenance of

manufacturing equipment; facility-wide testing, set-up and maintenance; and systems for

document management and data integrity.[2]

17.     The trade secrets JHL misappropriated are extremely valuable, especially to a

company racing to enter the biopharmaceutical market.  Creating a biologic medicine is

extremely challenging, and requires a tremendous investment in time, money, research, human

resources, and technical know-how.  Unlike traditional small molecule pharmaceuticals, which

are created through chemistry, biopharmaceuticals (also called "biologics") are proteins (such as

---

[2] The trade secrets at issue in this lawsuit are listed in Genentech's Statement Regarding Trade Secrets Pursuant to California Code of Civil Procedure Section 2019.210 ("2019.210 Statement"), which Genentech is filing concurrently with this Complaint. The 2019.210 Statement details, with particularity, Genentech's trade secrets, both in terms of standalone documents and compilations.

antibodies) that are created in genetically modified living cells.  Over the past decade, a large and growing market for "biosimilar" versions of biopharmaceutical products ("biosimilars") has emerged.  Because different living cells can impart different properties to the final product, it is infeasible to produce biosimilars that are *identical* to the original brand-name product (the "reference medicine") in the same way that a "generic" small molecule drug is.  But they must be "highly similar" to the reference medicine for the relevant regulatory authorities to allow them onto the market.  For example, to receive regulatory approval in Europe (one of JHL's primary markets), a biosimilar manufacturer must show through a complex series of tests and analyses that there are "no clinically meaningful differences between the biosimilar and the reference medicine in terms of safety, quality and efficacy."[3]

18.     With the biosimilar market worldwide expected to reach $41.7 billion by 2024, a number of well-established pharmaceutical companies and biotech startups are engaged in a high-stakes race to be the first to create biosimilar versions of innovators' medicines for which patent protection has expired, and bring those biosimilar medicines to existing and/or emerging markets.

19.     Manufacturing a biosimilar product with the necessary degree of similarity to its reference medicine is notoriously difficult.  The modified cells used to produce biologics can be sensitive to very minor changes in the manufacturing process.  Small process differences may significantly affect the drug's properties and, accordingly, its chances for regulatory approval.  And, even after approval, maintaining consistent quality in manufacturing processes over the long-term is crucial to both patient safety and commercial success; regulators expect biosimilar manufacturers to demonstrate competency and manufacturing know-how sufficient to have created a biosimilar medicine by themselves and to maintain quality manufacturing standards without relying on another manufacturer's methods.  As some in the industry have observed, for biosimilars, "the product *is* the process."  Erwin A. Blackstone & Joseph P. Fuhr, Jr., *The Economics of Biosimilars*, Am. Health & Drug Benefits, Vol. 6, No. 8 (Sept./Oct. 2013) (emphasis added).

---

[3] European Medicines Agency—Overview—Biosimilar Medicines (http://www.ema.europa.eu/ema/index.jsp?curl=pages/medicines/general/general_content_001832.jsp)

20.     To safeguard the considerable investment and innovation required to develop and implement the complex manufacturing processes for a biologic medicine, Genentech and other manufacturers protect the important details of those processes and methods as confidential, proprietary, and trade secret information.  Because biosimilar manufacturers will not have access to the innovator's analytical methods, release tests, or quality specifications for a reference medicine, they must develop their own.  The biosimilar manufacturer also will need to do side-by-side testing of its biosimilar product with the reference product using its own independently developed and validated tests or "assays."  Lastly, the biosimilar manufacturer must satisfy through an on-site inspection by regulatory authorities that its facilities and equipment meet the rigorous quality standards mandated by "Good Manufacturing Practices" ("GMP").  Because GMP is designed to ensure that biopharmaceuticals are consistently produced with the quality, safety, and effectiveness necessary for use in humans, regulators often delay drug approvals where there are problems identified with a manufacturer's processes for manufacturing operations.  Developing validated GMP-compliant processes and protocols is therefore critical for a biopharmaceutical manufacturer.

21.     Doing all this necessary work takes time and money, and an unscrupulous manufacturer can save both by stealing information that took the innovator many years to develop and refine at a cost of hundreds of millions of dollars.  That is what JHL did here.

22.     Shortly after Allen began consulting for JHL in mid-2013, Xanthe began downloading electronic copies of documents containing trade secrets relating to each of the Genentech medicines that JHL intended to copy.

23.     Xanthe meticulously saved and organized the downloaded confidential Genentech documents in a folder labeled "JHL," which she created and maintained on her Genentech-issued laptop computer.

24.     Xanthe's JHL folder contained subfolders, four of which were named for a Genentech medicine for which JHL hoped to develop a biosimilar version:

/ / /

/ / /

1

2       1155

3       Avastin_JHL

    Beigene (2109)

4       Herceptin_JHL

    JHL1922

5       Pulmozyme_JHL

    Rituxen_JHL

6   *Fig. 1, a screenshot from*                    *the "JHL" folder located on*

7   *Xanthe's Genentech-issued laptop*

8        25.     Within each of these four subfolders, Xanthe carefully arranged confidential

9   Genentech documents alongside JHL formulation and development documents.  She then used

10   the information contained in the Genentech documents to edit and improve JHL's documents and

11   processes, including by directly copying Genentech's trade secret information into JHL's

12   documents.

13        26.     All the while, JHL's co-founders, Racho Jordanov and Rose Lin, well understood

14   that Xanthe was employed at Genentech.  They knowingly received and utilized a significant

15   amount of stolen Genentech confidential materials and know-how, which JHL then put to use in

16   its own product development, formulation, manufacturing, and regulatory efforts.

17        27.     The scope of JHL's conspiracy to steal Genentech's trade secrets is vast, and the

18   intentional acts of theft and concealment in furtherance of that conspiracy are shocking.  For

19   example, at Jordanov and Lin's request, Xanthe took a month-long trip in December 2013 to

20   work as a "Visiting Scientist" in JHL's laboratory in Taiwan.   When her peers at Genentech

21   asked about her time away from work, she falsely described it as a "vacation."  But to a friend

22   outside of Genentech she revealed the truth in an email obtained by Genentech: "I have been at

23   JHL as a consultant on formulation development since Dec. 1st," she said, adding that she had to

24   "go to the lab to coach and help" and had been placed "in charge of the company" while its senior

25   management was in the United States.

26        28.     Xanthe did not go to JHL's lab empty-handed; she took along her Genentech-

27   issued laptop computer, which she had loaded with Genentech trade secret material in the JHL

28   subfolders described above, and connected it to JHL's network while she worked in, and was in

1    charge of, JHL's lab developing biosimilars of Genentech medicines.

2    29.    After returning home to California and going back to work at Genentech, Xanthe

3 continued to work directly for JHL. She downloaded additional confidential Genentech

4 documents into her JHL subfolders, and, used her personal email accounts to transmit the stolen

5 information to her husband and to other JHL personnel. She also personally drafted and edited

6 formulation documents, stability protocols and analytical methods for JHL's biosimilars, inserting

7 into those documents Genentech's confidential specifications from the trade secret materials she

8 had compiled. For example, a redlined draft of a JHL Stability Protocol found in Xanthe's

9 "Pulmozyme_JHL" folder shows that the identified author "Xanthe Lam" inserted edits and

10 comments into JHL's document, including by changing certain of JHL's testing parameters to

11 exactly match the confidential testing parameters in Genentech's proprietary Stability Protocol for

12 Pulmozyme®.

13    30.    For his part, Allen Lam served as a consultant for JHL starting in 2013 through the

14 fall of 2015, and then again for several months during 2017. JHL listed Allen as its "Director,

15 Quality Control" in a June 2015 presentation. Like Xanthe, Allen often worked remotely for JHL

16 from the Lams' home in South San Francisco, but he also spent periods of time on-site in Taiwan

17 and in JHL's manufacturing facility in Wuhan, China.

18    31.    The Lams facilitated their illicit work for JHL by working closely with Defendant

19 John Chan, a family friend whom Xanthe recruited to JHL in 2014 to serve as the company's

20 head of formulation and her "direct report." Xanthe funneled Genentech's trade secret

21 information to Chan during regular Skype calls, and occasionally through her husband. On one

22 such occasion, Xanthe sent an email to her husband attaching a confidential Genentech technical

23 report, instructing him to "**[m]ake a hard copy of the report attached for John. Don't give**

24 **him e-copy and tell him don't show it to others.**" Allen replied that he would follow those

25 instructions.

26    32.    Access to Genentech's confidential, proprietary, and trade secret information

27 helped catapult JHL's business trajectory. At an astonishing pace for a biotech startup with fewer

28 than 100 employees, JHL raised millions of dollars in private funding, went public on the Taiwan

stock exchange, and managed to obtain approval from European regulatory authorities to launch a clinical trial of a Rituxan® biosimilar in less than four years. By December 2016, JHL had inked a $236 million deal with French multinational pharmaceutical company Sanofi S.A. ("Sanofi"), and the two companies are now well on their way to marketing JHL's version of Rituxan® in China. JHL recently announced that it expects to start Phase III trials (typically the final stage of clinical testing required to support marketing approval) in Europe and in China during 2018.

33. JHL's development of biosimilars to compete with three other Genentech medicines has also progressed at lightning speed:

a) On February 22, 2018, JHL announced that it received approval from a European authority to conduct Phase I clinical trials of its Herceptin® biosimilar, and began those trials in March 2018.

b) On March 1, 2018, JHL became the first biosimilar manufacturer to receive regulatory approval to conduct clinical trials of a biosimilar version of Pulmozyme®, Genentech's cystic fibrosis treatment.

c) On April 16, 2018, JHL received approval to conduct Phase I trials of its biosimilar version of Avastin® in China, in addition to an ongoing Phase I trial of that product in Bulgaria, which European authorities permitted in February 2018.

d) In July 2018, JHL announced that it received regulatory approval to conduct its Phase I clinical trials of its Rituxan® biosimilar in China and its Phase III clinical trial of its Rituxan® biosimilar globally.

e) In early August 2018, JHL announced that it had received positive scientific advice from European regulators regarding planned Phase III clinical trials of its Avastin® and Herceptin® biosimilars.

34. Although JHL stands at the center of the conspiracy to profit from Genentech's trade secrets, the Lams' treachery extends beyond that company. In the course of investigating Xanthe's illicit work for JHL, Genentech discovered that as long ago as 2009, Xanthe and her husband also acted as paid consultants for two *other* Taiwanese biotech companies, Eusol and Mycenax, without Genentech's knowledge or consent. That unethical consulting relationship

10

ultimately led the Lams to JHL: Rose Lin, who was Eusol's plant manager before co-founding

JHL, first recruited Xanthe to Eusol, before later transitioning Xanthe's unlawful work to JHL.

35.     And in 2016 and 2017, two *additional* Taiwanese biotech companies,

APBiosciences, Inc. ("APBio") and OBI Pharma, Inc. ("OBI"), leveraged Xanthe's access to

Genentech's trade secrets for their own benefit, and to compete directly with Genentech's

medicines. APBio went so far as to list Xanthe as part of its "Leadership Team" in a presentation

given to prospective investors—*while Xanthe was still employed at Genentech.*

36.     Genentech first received notice of the wrongdoing alleged herein in October 2016,

thanks to a confidential tip from a Genentech employee. Genentech launched an internal

investigation that ultimately revealed the facts alleged in this lawsuit. Genentech also promptly

reached out to the United States Attorney's Office, which launched its own independent criminal

investigation. Careful not to interfere with the government's criminal investigation or alert

Xanthe to it, Genentech allowed Xanthe to continue working while closely monitoring her

activities. Genentech also refrained from filing this lawsuit until the criminal investigation had

resulted in indictments.

37.     After the FBI executed a search warrant on Xanthe's home on September 11,

2017, Genentech placed Xanthe on administrative leave, cutting off her access to Genentech's

documents and computer systems. Genentech fired Xanthe for gross misconduct on October 13,

2017.

38.     On October 29, 2018, the United States Government indicted Xanthe Lam, her

husband, Allen Lam, James Quach, and John Chan for Theft of Trade Secrets, 18 U.S.C. § 1832,

violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, as well as related charges for

conspiracy, aiding and abetting, and criminal forfeiture. Those charges are now pending in the

U.S. District Court for the Northern District of California. *See United States v. Lam et al.*, Case

No. 18-527 (N.D. Cal. Oct. 25, 2018).

39.     Before her termination and indictment, Xanthe freely admitted to the vast majority

of conduct alleged in this complaint during a series of voluntary interviews. For example, Xanthe

admitted to traveling to JHL in December 2013 and working in JHL's lab. She admitted to

creating directories on her Genentech-issued computer, organized by medicine, containing Genentech information alongside JHL documents. She admitted that the Genentech documents she downloaded and stored contain confidential, proprietary, and trade secret information that Genentech would never share with a competitor. She admitted to holding regular Skype calls with John Chan, to "coach" him in his role as JHL's formulation scientist. And she admitted to inviting James Quach to her home on three separate occasions, inappropriately providing him with access to her Genentech computer account, and allowing him to download and save a substantial amount of confidential Genentech documents on an external hard-drive shortly before he left for JHL's manufacturing plant in China.

40.     Similarly, Quach agreed to be interviewed, and admitted that once he knew he would be working for JHL, he sought access to confidential Genentech information through Xanthe. He further admitted that Xanthe granted him access to download these documents three times in July 2017, and that when he realized he needed additional confidential Genentech documents following his arrival at JHL, Xanthe downloaded and emailed those documents to him.

41.     From 2013 to the present, JHL has continued to use Genentech's confidential, proprietary, and trade secret information as it races to complete clinical trials and establish GMP-compliant manufacturing facilities so that it may gain regulatory approval to market its biosimilar products globally.

42.     Genentech has suffered and is continuing to suffer harm from this coordinated campaign of trade secret misappropriation. It therefore seeks injunctive relief to recover and protect its confidential, proprietary and trade secret information from Defendants' further misappropriation and use, and to stop Defendants from unlawfully and unfairly competing with Genentech and other law-abiding biopharmaceutical manufacturers. Genentech also seeks damages to compensate it for the costs, expenses, and other harms it has suffered as a result of Defendants' wrongful conduct.

## II.   THE PARTIES

### Plaintiff Genentech, Inc.

43.     Plaintiff Genentech, Inc. is a global leader in biotechnology. Over the past 40 years it has been discovering, developing, manufacturing, and commercializing biopharmaceuticals for a variety of medical conditions, including cancer, cystic fibrosis, multiple sclerosis, rheumatoid arthritis, heart attack, stroke and many others. It has been a wholly-owned member of the Roche Group since March 2009. Genentech is a corporation organized and existing under the laws of the state of Delaware. Its principal place of business is located at 1 DNA Way, South San Francisco, California, 94080. Genentech employs more than 9,000 employees at its South San Francisco campus, and over 4,000 additional employees in various locations across the United States, including at manufacturing facilities in Vacaville and Oceanside, California.

### Defendant JHL Biotech, Inc.

44.     Defendant JHL Biotech, Inc. is an aggressively expanding biotech startup with significant venture capital support, including from prominent American investors. JHL is actively working to bring biosimilar and other biologics products to market that will compete directly with Genentech's medicines. In addition to developing biosimilar versions of Pulmozyme®, Rituxan®, Herceptin®, and Avastin®, JHL has partnered with China-based biopharma BeiGene, Ltd. to assist with developing and manufacturing certain new biologic products in BeiGene's early stage pipeline program. One of those new biologics is targeting the same pathway (anti-PD-L1), as Genentech's Tecentriq® medicine.

45.     Former Genentech employees Racho Jordanov and Rose Lin founded JHL in 2012. According to JHL's corporate website, JHL is "[l]ed by an experienced team of Genentech and Amgen veterans." On information and belief, by January 2014, at least 25 percent of JHL's 40-person workforce was made up of former Genentech employees.

46.     Although JHL's principal place of business is in Hsinchu, Taiwan, it routinely conducts business in the State of California. JHL's CEO Racho Jordanov, and its General Manager Rose Lin, both maintain residences in California, and in email correspondence, both

Jordanov and Lin listed JHL's "U.S. Office" as being located in Rancho Santa Fe, California. Jordanov has also publicly stated that JHL has "a collaboration with a discovery company from San Francisco" and is "doing process development for a biotech company in San Francisco." PharmaDJ, *An Exclusive Interview With JHL*, Apr. 12, 2016, http://m.8081.net/yyyls/yy/393342.html.

47.     On information and belief, JHL has had continuous and systematic contacts with the State of California, has purposely directed activities at the State of California, and this action arises out of and relates to those activities. As alleged herein, JHL's conduct occurred in California or was directed at Genentech, a California-based company.

**Defendant Xanthe Lam**

48.     Defendant Xanthe Lam, Ph.D. (a/k/a Mei Ling Sheung) began working at Genentech in 1986. For more than 31 years, Xanthe worked in various capacities as a Genentech scientist, and had access to some of Genentech's most sensitive confidential, proprietary, and trade secret information.

49.     Xanthe was Genentech's lead formulator for several drugs, including Tecentriq®, Lucentis®, and Herceptin®.

50.     Xanthe also led Genentech's marketed product support group within late stage pharmaceutical development. In this role, she supported the process changes for the manufacture of drug substances (including Pulmozyme®), provided technical assessments, and analyzed process deviations and discrepancies.

51.     Xanthe was promoted to Principal Scientist in October 2013 and was employed by Genentech until she was fired on October 13, 2017 in connection with the gross misconduct described herein.

52.     Xanthe resides in South San Francisco, California with her longtime husband, Defendant Allen Lam.

**Defendant Allen Lam**

53.     Defendant Allen Lam is Xanthe Lam's husband, and, at least until the Government's investigation regarding this matter came to light, was a consultant for JHL. Most

recently, Allen consulted for JHL at its Wuhan, China manufacturing facility from July through September of 2017.

54.    Allen worked in Quality Control at Genentech from 1989 to 1998. On information and belief, Allen consulted for Eusol starting in 2010, for Mycenax starting in 2011, and for JHL since at least 2013, and he was deeply involved in JHL's efforts to develop biosimilars of Genentech's Rituxan®, Pulmozyme®, Avastin®, and Herceptin® medicines.

55.    On information and belief, Allen received 20,000 JHL stock options in 2013, invested in JHL's Series B round of financing in April 2015, prior to JHL's public stock offering in Taiwan, and received a salary from JHL of approximately $10,000 per month.

56.    Allen resides with Xanthe in South San Francisco, California.

**Defendant James Quach**

57.    Defendant James Quach (a/k/a Phat Trang Quach) worked at Genentech for 17 years, from 2000 to 2017, until Genentech fired him in April 2017 for unacceptable performance.

58.    Following his termination from Genentech, Quach contacted Defendant Xanthe Lam for assistance in securing employment at JHL. Quach applied for a position at JHL in May 2017, and by July 2017 had accepted an offer to work at JHL's manufacturing facility in Wuhan, China, where, on information and belief, he continued to work through at least December 2017.

59.    On information and belief, Quach resides in Daly City, California.

60.    On information and belief, Quach has had continuous and systematic contacts with the State of California, has purposely directed activities at the State of California, and this action arises out of and relates to those activities. As alleged herein, Quach's conduct occurred in California or was directed at Genentech, a California-based company.

**Defendant Racho Jordanov**

61.    Defendant Racho Jordanov is JHL's co-founder, President, CEO, and Co-Chairman. He worked at Genentech for 30 years, from 1981 to 2011. He left Genentech in May 2011 on unfavorable terms. In 2012, he co-founded JHL along with Defendant Rose Lin. On information and belief, Jordanov resides in Rancho Santa Fe, California.

62.    On information and belief, Jordanov is a member of the board of directors of a

1  South San Francisco-based non-profit organization run by Rose Lin, referenced below.

2      63.    On information and belief, Jordanov has had continuous and systematic contacts

3  with the State of California, has purposely directed activities at the State of California, and this

4  action arises out of and relates to those activities.  As alleged herein, Jordanov's conduct occurred

5  in California or was directed at Genentech, a California-based company.

6  **Defendant Rose Lin**

7      64.    Defendant Rose Lin is JHL's co-founder and General Manager.  Lin worked at

8  Genentech for 21 years, from 1987 to 2009, holding various roles in areas such as Good

9  Manufacturing Practices ("GMP") Systems, Clinical Manufacturing, Clinical Packaging,

10  Commercial Packaging and as a Biochemical Project Manager.  After leaving Genentech on

11  unfavorable terms in 2009, Lin moved to Taiwan where she served as the Plant Director at Eusol

12  Biotech, Inc. from December 2009 to August 2012.

13      65.    On information and belief, Lin both owns real property and runs a non-profit

14  organization located in South San Francisco, California.

15      66.    On information and belief, Lin has had continuous and systematic contacts with

16  the State of California, has purposely directed activities at the State of California, and this action

17  arises out of and relates to those activities.  As alleged herein, Lin's conduct occurred in

18  California or was directed at Genentech, a California-based company.

19  **Defendant John Chan**

20      67.    Defendant John Chan worked at JHL in Taiwan from approximately April 2014 to

21  approximately July 2017.  Chan is a family friend of Defendant Xanthe Lam, and JHL hired him

22  at Xanthe's insistence.

23      68.    On information and belief, Chan served as a "Project Manager + Scientist" at JHL

24  from May 2014 to May 2015, and a "Project Lead + Group Leader" from June 2015 to at least

25  July 2016. Ex. A. Chan has also described his role at JHL as "head of the Pulmozyme®

26  biosimilar project."

27      69.    While at JHL, Chan participated in regular Skype calls with Xanthe during which

28  he would request and receive information including or derived from Genentech's confidential,

proprietary, and trade secret information.

70.     Chan left JHL in 2017, and with Xanthe's assistance, found employment at another biopharmaceutical company headquartered in San Francisco, California.

71.     On information and belief, Chan currently resides in San Francisco, California.

72.     On information and belief, Chan has had continuous and systematic contacts with the State of California, has purposely directed activities at the State of California, and this action arises out of and relates to those activities.  As alleged herein, Chan's conduct occurred in California or was directed at Genentech, a California-based company.

**Does 1–50**

73.     Genentech is currently unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued herein as Does 1 through 50, inclusive, and Genentech therefore sues these Doe defendants by fictitious names.

74.     Genentech will amend its Complaint by asserting their true names and capacities following determination of such names and capacities.  Genentech is informed and believes, and on that basis alleges, that fictitiously named defendants are each responsible in some manner for the harms and conduct alleged in this Complaint, and that Genentech suffered harm, as alleged herein, by such defendants.

**III.     JURISDICTION AND VENUE**

75.     Genentech repeats and incorporates by reference all prior allegations of this Complaint as if fully set forth herein.

76.     This Court has personal jurisdiction over each of the named defendants.  As alleged herein, each of the defendants has had continuous and systematic contacts with the State of California, has purposely directed activities at the State of California, and this action arises out of and relates to those activities.  As alleged herein, each defendant's conduct occurred in California or was directed at Genentech, a California-based company.

77.     This Court has subject matter jurisdiction of this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over the other claims asserted

1    herein pursuant to 28 U.S.C. § 1367.

2        78.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a

3    substantial part of the events giving rise to Genentech's claims occurred within the Northern

4    District of California. JHL, through its agents including Xanthe Lam, Allen Lam, and James

5    Quach, accessed and downloaded Genentech's confidential, proprietary, and trade secret

6    information from within this judicial district.

7    **IV.    INTRADISTRICT ASSIGNMENT**

8        79.    Pursuant to Civil L.R. 3-2(c), this case should be assigned to the San Francisco

9    Division of this Court because the action arises in San Mateo County.

10    **V.    FACTUAL ALLEGATIONS**

11        **A.    Developing marketable biologics and biosimilars is an expensive and complex
              process where access to proven analytical data and methods is highly
12             valuable.**

13            **1.    Genentech has invested billions of dollars developing life-saving
                    biologic medicines.**

14

15        80.    For more than four decades, Genentech has been at the forefront of discovering,

16    developing, manufacturing, and commercializing cutting-edge biopharmaceutical medicines for a

17    variety of serious and life-threatening diseases.

18        81.    Unlike "small molecule" drugs that are created solely using chemistry,

19    biopharmaceuticals or "biologics" are recombinant proteins produced by genetically modified

20    living cells. Such medicines are strictly regulated by the United States Food and Drug

21    Administration ("FDA") and other regulatory authorities abroad, including the United Kingdom's

22    Medicines & Healthcare Products Regulatory Agency ("MHRA"), the European Medicines

23    Agency ("EMA"), the China Food and Drug Administration ("CFDA") and the Taiwan Food and

24    Drug Administration ("tFDA").

25        82.    Over the past several decades, Genentech has successfully brought to patients

26    multiple pioneering biologic medicines. For example:

27            a)    In 1993, Genentech gained FDA approval for Pulmozyme® (dornase alfa),

28    which is a recombinant DNase used as an inhalation treatment for children and young adults

with cystic fibrosis.

b)      In 1997, Genentech gained FDA approval for an antibody drug known as Rituxan® (rituximab), which doctors use to treat certain patients suffering from non-Hodgkin's lymphoma—a type of cancer.[4]  Genentech gained regulatory authorization to market rituximab in other jurisdictions globally, where it is marketed under the trade name MabThera®. Rituxan® has also received subsequent approvals for other indications, including rheumatoid arthritis.

c)      In 1998, Genentech obtained FDA approval for Herceptin® (trastuzumab), which is used to treat metastatic breast cancer patients with tumors that overexpress the HER2 gene.  Herceptin® has also more recently received approval as an adjuvant therapy for certain breast cancer patients and to treat some forms of metastatic gastric cancer.

d)      In 2004, Genentech received FDA approval to market Avastin® (bevacizumab) for the treatment of metastatic colorectal cancer.  Avastin® received subsequent approvals for other types of cancer.

e)      In May 2016, Genentech obtained FDA approval of Tecentriq® (atezolizumab) for the treatment of a type of advanced bladder cancer.  Six months later it was additionally approved for the treatment of a type of metastatic lung cancer.  Tecentriq® targets PD-L1, a protein found on certain immune cells and cancer cells, and is the first FDA-approved PD-L1 inhibitor.  Tecentriq® is the latest example of a class of medicines known as immune checkpoint inhibitors that are intended to boost the body's immune response to certain cancers.

**2.      In recent years, a large, rapidly growing, and lucrative market has emerged for "biosimilars" to compete with biologics.**

83.      The market for traditional chemically-synthesized brand name pharmaceuticals has experienced competition from generic drugs for more than 30 years under the Hatch-Waxman Act.  That legislation made it easier and less expensive to bring a generic drug to market by dispensing with the need for lengthy human clinical trials and allowing a company to obtain regulatory approval for a generic drug based on a showing that the generic has the same active

---

[4] Rituximab was first discovered by IDEC Pharmaceuticals (now known as Biogen Inc.).  Biogen and Genentech have jointly developed and co-marketed Rituxan® in the United States since receiving FDA approval in November 1997.

ingredients and works the same way in the patient's body as the brand name drug. By contrast, the market for lower cost versions of biologic medicines, called "biosimilars," has emerged relatively recently.

84.     Biologic medicines are specially engineered proteins that are produced in and purified from living cells using highly specialized, complex manufacturing processes. Because of differences resulting from making these proteins in different living cells, and some unavoidable variability in other parts of the complex manufacturing processes, there is no way to create an identical generic product as is possible with traditional chemical pharmaceuticals. Aspects of the detailed molecular structure of the protein will vary depending on the specific parameters of the manufacturing process. In recent years, regulatory authorities throughout the world have begun allowing a shorter, less expensive regulatory pathway for biosimilars that is based on a showing that the biosimilar is highly similar to an existing biologic medicine. These abbreviated regulatory approval pathways allow biosimilar applicants to rely largely on the human clinical trials conducted by the innovator companies (like Genentech) whose novel medicines they intend to mimic, reducing the time and expense otherwise required to gain regulatory approval.

85.     But to benefit from the time and cost savings afforded by the abbreviated biosimilar approval pathways (with fewer and shorter clinical trials), biosimilar manufacturers are required to provide robust analytical data showing biosimilarity. For example, the FDA has provided Guidance for the Industry regarding "Quality Considerations in Demonstrating Biosimilarity of a Therapeutic Protein Product to a Reference Product."[5] The FDA explained in this Guidance that "[c]omparative analytical data provide the foundation for a biosimilar development program and can influence decisions about the type and amount of animal and clinical data needed to support a demonstration of biosimilarity."

86.     The global biotech industry anticipates a huge, expanding market for biologics and biosimilars. This expected exponential growth is based in part on the fact that the primary patent

---

[5] U.S. Dep't of Health & Human Svcs., Food & Drug Administration, *Quality Considerations in Demonstrating Biosimilarity of a Therapeutic Protein Product to a Reference Product*, https://www.fda.gov/downloads/drugs/guidances/ucm291134.pdf. Apparently recognizing the significance of this FDA Guidance to her illicit consulting work for JHL, Ms. Lam downloaded a copy of this Guidance document to her "JHL" desktop folder in June 2015.

1   protection for many blockbuster biologic medicines will begin to expire over the next several

2   years. Indeed, JHL's website states that "[o]ver $100 billion of biologic pharmaceutical products

3   are expected to lose patent protection and many large monoclonal antibody therapies are coming

4   off patent globally after 2018." JHL's website goes on to tout the anticipated impact of

5   biosimilars on the market for biologics: "Development of biosimilars is expected to restrain

6   biologics year on year growth and take away market shares from biologics."[6]

7           **3.      Developing biosimilars requires complex data analysis, and access to
                       an innovator's trade secrets would aid the process significantly.**

8

9           87.     The process of biosimilar development is complex, and critical to a manufacturer's

10  success. As one observer has noted, for biologics, "the product is the process."[7] For that reason,

11  "biosimilar manufacturers rely much more on production processes as a critical feature to produce

12  a reference biologic."[8]

13          88.     To obtain the comparative analytical data required for regulatory approval of a

14  biosimilar, the biosimilar manufacturer must run a series of tests on both the reference product

15  (here, the approved Genentech medicine) and the biosimilar product, producing test results

16  showing the two products are highly similar in terms of safety, purity, and potency. While some

17  analytical methods are standardized, many of the testing methods are unique and proprietary to

18  the original manufacturer. For example, the United States Pharmacopeia (USP) Council of

19  Experts establishes and publishes monographs containing standard methods for assessing the

20  identity, strength, quality and purity of drug products. But this publicly available information is

21  different, and less specific, than the confidential and proprietary test methods and specifications

22  developed by innovator companies like Genentech. The USP's website provides an instructive

23  "infographic" that explains the difference in the purpose and scope between the "Public Standard"

24  set forth in a USP monograph and the "Private Specifications" created and used by the

25  manufacturer, including that the Private Specifications are "[k]nown only to the manufacturer and

26  _____

[6] Biosimilars: High Quality Affordable Biologics, JHL, http://www.jhlbiotech.com/biosimilars/.

27  [7] Erwin A. Blackstone & Joseph P. Fuhr, Jr., *The Economics of Biosimilars*, Am. Health & Drug
    Benefits, Vol. 6, No. 8 (Sept./Oct. 2013).

28  [8] *Id.*

regulator," "[c]an only be used by regulator and company that developed it," and are "[b]ased on proprietary knowledge and information."[9] Also proprietary to the original manufacturer are the detailed, product-specific commercial manufacturing specifications for a given medicine.[10] Lacking access to that proprietary information, biosimilar manufacturers are expected and required to develop and implement their own analytical methods, tests, and manufacturing specifications to successfully manufacture and obtain regulatory approval for a biosimilar.

89.     Having access to the innovator's proprietary test procedures, protocols, results, and specifications for the reference product would save a biosimilar manufacturer a great deal of time and expense that it would normally be required to spend to independently develop and implement its own procedures and processes that are rigorous enough to pass regulatory muster.  Saving time is extremely valuable for biosimilar manufacturers, since getting to market quicker is a key commercial goal and translates to potentially hundreds of millions of dollars in increased product sales revenue and market share.

90.     Moreover, when approving or rejecting a biological medicine for commercial sale, regulatory agencies do more than consider the ultimate molecules produced—they also enforce rigorous quality standards throughout the manufacturing process.  Regulatory authorities demand that producers adhere to "Good Manufacturing Practices" ("GMP") that ensure biopharmaceuticals are consistently produced with the quality, safety, and effectiveness necessary for use in humans.  Regulators regularly inspect or audit biopharmaceutical manufacturing facilities to ensure they are GMP-compliant.  Developing manufacturing processes and specifications to satisfy GMP standards is a critical undertaking for any biopharmaceutical company, but it is an expensive and demanding process.

---

[9] The Role of a Public Drug Quality Standard, U.S. Pharmacopeial Convention, http://qualitymatters.usp.org/sites/default/files/user-uploaded-files/Critical-Role-of-Public-Standard-Infographic.pdf.

[10] In draft biosimilar development guidelines published by the EMA that Xanthe downloaded to her "JHL" folder in 2014, the EMA itself "acknowledged that the manufacturer developing a biosimilar would normally not have access to all information that could allow an exhaustive comparison with the reference medicinal product, particularly with regards to the manufacturing process." (European Medicines Agency, Guideline on similar biological medicinal products containing biotechnology-derived proteins as active substance: quality issues (revision 1) EMA/CHMP/BWP/247713/2012) [WC500127960.pdf]

COMPLAINT
Case No.

91.     Problems with manufacturing facility maintenance and validation processes can lead to costly delays.  For example, in August 2017 the FDA issued a Form 483 (a pre-enforcement auditor's report of possible regulatory violations) to Biocon, a biosimilar manufacturer attempting to develop and market a biosimilar to Genentech's Herceptin® medicine. The FDA found deficiencies in a range of manufacturing issues, including aseptic processing, microbiological monitoring for controlled environments, data recording, cleaning and maintenance of equipment, and even Biocon's procedure for buying sterile gloves for employees.[11]  Analysts reviewing the citation noted that problems in the manufacturing processes can result in costly delays to biosimilar approval.  This proved true for Celltrion, Inc. in April 2018, when the FDA rejected its marketing applications for biosimilar versions of Rituxan® and Herceptin® based on its inspection of Celltrion's South Korean facility which revealed microbial contamination risks and inadequate training in addition to media fill deficiencies.[12]

92.     As the examples above make clear, having access to the standard operating procedures and maintenance and equipment validation processes that supported the regulatory approval for the innovator's reference product would be highly valuable to a biosimilar manufacturer such as JHL.

**B.     Genentech scrupulously protects its confidential, proprietary, and trade secret information.**

93.     Because Genentech's confidential, proprietary, and trade secret information is so critical to its operations, Genentech takes the protection of that information seriously and has instituted multiple safeguards to prevent its unauthorized disclosure or misappropriation.

a)     As a condition of employment, Genentech requires every employee to sign a written agreement concerning non-disclosure of proprietary information.

b)     Genentech has developed and distributed to all employees written policies

---

[11] FDA Form 483 issued to Biocon Limited on June 3, 2017, https://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/CDERFOIAElectronicReadingRoom/UCM569851.pdf)

[12] *See* Celltrion's Statement on CRLs from the U.S. FDA for rituximab and trastuzumab biosimilar (https://www.celltrion.com/en/pr/newsDetail.do?seq=482); FDA Warning Letter 320-18-2 issued to Celltrion, Inc. on January 26, 2018, https://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm594395.htm)

governing employees' conduct including policies regarding use, handling and non-disclosure of confidential information and avoiding conflicts of interest that may compromise Genentech's proprietary information.

       c)     Genentech ensures that employees are aware of the strictures of its policies governing employee conduct by requiring employees to annually certify compliance with these policies.

       d)     Genentech makes adherence with its policies, including the policies concerning nondisclosure of confidential information, a condition of employment, provides procedures for employees to report suspected noncompliance, and disciplines employees for violating such policies, up to and including termination.

       e)     Genentech has implemented robust document control systems to protect its confidential, proprietary, and trade secret information.  For example, Genentech computer systems and electronic document repositories are password-protected and accessible only to employees and other authorized persons who possess a company-issued user name and a current password.

       f)     Genentech takes steps to ensure that no confidential information is disseminated at conferences or in other public forums.

94.     Genentech has taken all of these steps to prevent its current and former employees, including specifically Xanthe and Quach, from inappropriately disclosing and misusing its confidential, proprietary, and trade secret information. But Xanthe and Quach knowingly violated and surreptitiously evaded the measures Genentech has put in place.

       **1.**     **As with all its employees, Genentech required Xanthe, Allen, Jordanov, Lin, and Quach to sign a Proprietary Information and Inventions Agreement.**

95.     When Xanthe was hired in 1986, Genentech required her to sign, as a condition of employment, an "Employee's Proprietary Information and Inventions Agreement" ("Proprietary Information Agreement"). *See* Ex. B (Proprietary Information Agreement).  Xanthe signed that agreement on August 19, 1986. By signing the Proprietary Information Agreement, Xanthe confirmed that, in consideration of her employment and the compensation received, she would

"keep in confidence and trust all Proprietary Information."

96.     When Quach was hired in 1992, Genentech required him to sign, as a condition of employment, a Proprietary Information Agreement. *See* Ex. C (Proprietary Information Agreement). Quach signed that agreement on September 12, 1992. By signing the Proprietary Information Agreement, Quach confirmed that, in consideration of his employment and the compensation received, he would "keep in confidence and trust all Proprietary Information."

97.     All of the other former Genentech employee Defendants here—Allen Lam, Racho Jordanov, and Rose Lin—were also required to sign, as a condition of their employment, a Proprietary Information Agreement that was substantially similar to those signed by Xanthe and Quach.

98.     These Proprietary Information Agreements define "Proprietary Information" as "information that has been created, discovered, developed, or otherwise become known to the Company . . . and/or in which property rights have been assigned or otherwise conveyed to the Company, which information has commercial value in the business in which the Company is engaged." By way of illustration, the Proprietary Information Agreements list "trade secrets, processes, formulas, data and know-how, improvements, inventions, techniques, marketing plans, strategies, forecasts, and customer lists" as examples of Proprietary Information.

99.     By executing the Proprietary Information Agreement, Xanthe and Quach agreed that they would "not use or disclose any Proprietary Information or anything relating to it without the written consent of the Company." They further agreed they would "not, without the Company's express written consent, engage in any employment or activity other than for the Company in any business in which the Company is now or may hereafter become engaged." They further agreed that, upon termination of their employment for any reason, they each would "deliver to the Company all documents and data of any nature pertaining to my work with the Company and [would] not take with me any documents of [sic] data of any description or any reproduction of any description containing or pertaining to any Proprietary Information."

### 2. Genentech's policies governing employee conduct prohibit disclosure and misuse of its confidential, proprietary and trade secret information.

100. At all relevant times, Genentech's written policies governing employee conduct contained strict rules concerning the protection of Roche and Genentech's confidential information. Prior to March 2011, Xanthe's (and others') duties as a Genentech employee were governed by the Genentech Good Operating Principles ("GGOP"). *See* Ex. D. The GGOP required employees to "[p]rotect Genentech's confidential information from inappropriate disclosure to others" and prohibited employees from "us[ing] Genentech's confidential information for personal benefit or for a third party." Further, the GGOP provided that Genentech's confidential and proprietary information must be used only for Genentech's benefit and not disclosed to others or used for personal profit or for the benefit of others outside of Genentech.

101. Since March 2011, the Roche U.S. Pharma Code of Conduct ("Code of Conduct") has governed Genentech employees, including Xanthe and Defendant James Quach. *See* Ex. E. The Code of Conduct expressly provides that "employees may not (either during or after employment) give or release any trade secret, proprietary information [or] confidential information . . . acquired during employment with Roche or Genentech to anyone not employed by Roche or Genentech or to any other employee not having a current, legitimate business need to know such secret or information unless authorized by management." To this end, the Code of Conduct expressly prohibits employees from disclosing proprietary information in public fora without consulting or receiving approval from the employee's manager and department head, followed by review from legal or other departments, depending on the nature of the information being disclosed; requires employees to "appropriately safeguard[]" company computer systems to prevent the unauthorized copying of information; and emphasizes that employees must refrain from sharing confidential information even after termination of their employment.

102. The Code of Conduct also contains clear policies relating to employees' electronic

communications.[13] *See* Ex. D at 45 (E-Communications Policy).  It provides that employees may use company "electronic facilities," including computers, phones, network, and email, for "personal, non-business purposes" only if "such use does not interfere with [] work performance or company business."  Employees may not "forward [] email to non-Roche or Genentech email accounts" or "send company confidential information outside of the Roche Group."

> **3.    Genentech requires employees to be trained on its policies and to certify their knowledge of and compliance with those policies.**

103.    Under both the GGOP and the Code of Conduct, every Genentech employee is required to take training and certify compliance with the company's policies including those regarding protection of Genentech's confidential information. Under the GGOP, managers were required to "make sure . . . employees fully understand and adhere to our GGOP."

104.    Xanthe was trained on the GGOP in 2008 and certified compliance with the GGOP on February 4, 2011.  Xanthe took Genentech's Code of Conduct training on April 8, 2011, and certified compliance with the Code of Conduct on multiple occasions thereafter, including on July 5, 2017; July 2, 2016; July 10, 2015; May 6, 2014; and May 13, 2013.[14]

105.    The annual certification requires Genentech employees to certify that they have not violated the Code of Conduct, and specifically asks whether employees are aware of "any conduct either by yourself or others that has occurred that you believe may violate any federal, state, or local law, regulation, rule, or other requirement, or any Company policy, procedure, or directive."

106.    Quach took Genentech's Code of Conduct training, and certified compliance with the Code of Conduct on June 8, 2014.  He took an Ethics Certification in May 2015, and a Records Management & E-Communications training in March 2013 and again in November 2015.

107.    Quach and Xanthe also received specific instructions on protecting Genentech's

---

[13] Xanthe certified compliance with Genentech's e-communications policy on January 5, 2016; March 22, 2013; and September 1, 2010.

[14] Xanthe also completed Genentech's ethics certification on March 16, 2015 and November 12, 2014.

confidential, proprietary and trade secrets as part of Genentech's Information Security End User Awareness training. The training explains, among other things, that employees must always have their employee badges in order to enter controlled areas; that USB drives containing confidential information must be properly stored and locked at all times; that company emails may not be forwarded to personal accounts; that employees may not use cameras or other recording devices in secure areas; that employees may never share their password with anyone; that employees may never let anyone else use their badge; and that employees "all have a responsibility to report suspected security incidents for investigation," including "any unauthorized access to Roche information." In addition, the training materials define trade secrets as information that is not publicly available and may provide a competitive advantage, and explains that such secrets include: "lab information, formulas, and compounds"; "company processes, procedures, and practices"; and "manufacturing and quality control data." Xanthe completed this training on July 16, 2014, and Quach completed it on August 14, 2014.

        **4.**    **Genentech requires adherence to its policies, expects employees to report any suspected noncompliance, and strictly enforces its policies and proprietary agreements.**

108. The GGOP provided that any violation of its policies "could result in disciplinary actions up to and including termination of employment with Genentech." Similarly, adherence to Genentech's Code of Conduct is a mandatory "condition of employment." The policy provides that Genentech will "not tolerate violations of the Code of Conduct" and that "[e]mployees must be aware that such violations can have serious consequences for the company and for themselves and that they will be held accountable." Genentech further cautions employees that violating the Code of Conduct "is a disciplinary offense and may result in a disciplinary action up to and including termination of employment, as well as civil and criminal penalties under state and federal laws."

109. Under both the GGOP and Code of Conduct, Genentech expects its employees promptly to report suspected or actual violations and provides procedures and mechanisms to do so, including a toll-free compliance hotline that is available 24 hours a day, every day. Here, this policy and the availability of the compliance hotline led Genentech to discover Xanthe's

1   extensive misconduct and the other named defendants' involvement, despite Xanthe's efforts to

2   conceal her actions.

3       110.   Genentech has rigorously enforced its GGOP, Code of Conduct, and Proprietary

4   Information Agreements with employees.   Over the past several years, Genentech has taken

5   several employment actions, up to and including termination, against employees who have

6   breached these policies and agreements.

7       **5.   Genentech has implemented robust document control systems and
          physical security measures to protect its confidential information.**
8

9       111.   At all relevant times, Genentech has maintained and required its employees to

10  maintain its confidential and proprietary information and data in secure document management

11  systems.  For example, Genentech currently uses a document control system called Condor.

12  Condor serves as a protected repository for controlled documents—namely, documents

13  Genentech references in support of regulatory filings and in compliance with regulatory

14  requirements.  Prior to using Condor, Genentech employed a similar document control system

15  called DocLink.

16      112.   Both DocLink and Condor are password-protected, and accessible only to

17  Genentech employees and authorized contractors.

18      113.   Similarly, Genentech's email system and computer servers are access-controlled.

19  Genentech employees can gain access to their Genentech email and the company's servers only

20  by using a unique "UNIX id" and password.

21      114.   Complementing its document control system, Genentech also maintains robust

22  physical security measures.  In general, only Genentech employees and authorized contractors are

23  granted regular permission to enter Genentech's facility.  Each employee's or authorized

24  contractor's badge serves as an electronic key-card, which must be used to enter any of the

25  company's secure areas.  All laboratories and offices are within the secure perimeter.

26      **6.   Genentech routinely redacts confidential information from all of its
          public filings and works with the FDA to ensure that it does the same.**
27

28      115.   Genentech also guards its trade secret data by implementing strict controls over the

information it shares publicly. As specified in an internal guidance document, the company labels certain information as "Commercially Confidential Information" (CCI), which **should be redacted from all documents before release to the public."** The document explains that information related to chemistry, manufacturing, and controls for the company's medicines—which includes "[d]ata concerning active substance, formulation, and manufacturing and test procedures and validation" and "information on the test methods used and specification and quantitative acceptance criteria established for the active substance"—will *always* be considered CCI requiring redaction because such information "could give competitors and generic and biosimilar companies substantial advantages."

116. To this end, Genentech ensures that any documents to be shared publicly are redacted to protect this information. The publicly available FDA review materials concerning each of Genentech's approved drugs contain redactions of Genentech's confidential methods, data, test results, and product specifications. In addition, when Genentech contributes to published scientific literature, it withholds confidential and proprietary information, including product validation criteria, protocols, test procedures, and the like.

**C. Genentech prohibits its employees from engaging in activities that would raise conflicts of interest with Genentech, including the conduct alleged herein.**

117. The GGOP provided specific guidance regarding conflicts of interest. It directed employees to "[a]void conflicts of interest (real or perceived)" and to "[d]isclose to your manager any material transaction or relationship that reasonably could be expected to result in a conflict of interest." It explained:

"A common area in which conflicts of interest may arise are offers to work or consult for another company or other for-profit or non-profit entity or professional group. . . . Your work for Genentech should be your primary focus, and any involvement in activities for the benefit of others should not interfere with your work for Genentech and must be done on your personal time. . . . **In all cases, the activity must not create either a conflict of interest or a risk of disclosure or misuse of Genentech's confidential information. You may not use or disclose any confidential Genentech information to the other entity or person.** Ex. D (emphasis added).

118. Likewise, Genentech's Code of Conduct provides express guidance and prohibitions regarding conflicts of interest. It explains:

"Employees should avoid situations where their personal interest could conflict with, or even appear to conflict with, the interests of Roche or Genentech. A conflict of interests exists when an employee uses his/her position, responsibilities or connection with Roche or Genentech for personal or family gain apart from the normal rewards of employment and compensation by Roche or Genentech. **It also exists when an employee's personal interests are inconsistent with those of Roche or Genentech and create conflicting loyalties. Such conflicting loyalties could cause an employee to give preference to personal or family interests in situations where responsibilities to Roche or Genentech should come first.** For purposes of this policy, family members include, but are not limited to, your spouse . . . . **An employee should not take part, or exert any influence, in any transactions where the employee's own interests may conflict with the best interests of Roche or Genentech.**" Ex. E (emphasis added).

119.    Further, the Code of Conduct provides "[e]xamples of situations which constitute prohibited conflicts of interest," including where an employee:

a)      "Has an outside interest which materially impacts on the employee's time or attention which should be devoted to Roche or Genentech affairs . . . ."

b)      "Has an interest or relationship with an outside individual or company. . . which is inherently unethical or which might . . . [r]ender the employee partial toward the outsider for personal reasons, or influence his/her judgment in making sound business decisions solely in the best interest of Roche or Genentech."

c)      "Has any interest or relationship, or acts in a way, which is or may be detrimental to best interests of Roche or Genentech."

d)      "Uses or lets others use any confidential knowledge of Roche or Genentech activities for personal gain, or Roche or Genentech property or assets for unauthorized personal or family purposes."

120.    The Code of Conduct also provides examples of "specific situations which ordinarily would constitute a prohibited conflict of interests," including where an employee:

a)      "Has a relatively substantial . . . personal or family investment in an enterprise which has business relationships with Roche or Genentech as a . . . competitor . . . ."

b)      "Receives compensation as an employee, an officer, a consultant, or a member of the board of directors of a supplier, vendor, jobber, agent, consultant, customer or competitor."

121.    The Code of Conduct also provides strict guidelines regarding permissible

"Outside Employment." It states that Roche and Genentech employees "may not engage in any outside employment, business or other activity for which he/she receives compensation if such activity relates to his/her duties at Roche or Genentech, to his/her profession or to Roche or Genentech's area of interest, except as may be authorized in writing on the Consultancies & Outside Employment Approval Form by the employee's manager, and if necessary, the employee's department VP."

122.   Genentech employees must seek approval for any "Outside Activities." The Code of Conduct explains that, "as employees in the highly regulated pharmaceutical industry, it is important to be aware that even voluntary free-time, outside activities related to the business such as board memberships at a local hospital or committee work in a professional organization may raise issues. It is therefore essential that an employee speaks with his or her manager before engaging in outside activities."

123.   The Code of Conduct also regulates employees' participation in external speaking engagements. With respect to all such engagements, the Code of Conduct provides that a "request to participate in a speaking opportunity must be approved in advance of accepting the opportunity by the employee's supervisor and department head. . . . If the speaking opportunity has been approved, the speech and/or talking points and any visuals (e.g. PowerPoint slides, handouts, etc.) must be reviewed by the approving supervisor and department head to ensure that messages are appropriate and confidential or proprietary information is secure."

124.   Genentech has long treated these prohibitions with the utmost seriousness. Indeed, when Defendant Allen Lam was a Genentech employee many years ago, he violated Genentech's policies against conflicting outside employment. Allen took a sabbatical from Genentech in mid-1998. While on sabbatical, he secured employment with a competitor company, Aradigm. Aradigm learned that Allen was still employed at Genentech and contacted Genentech to alert them to the conflict of interest. Allen admitted that he had accepted a job at Aradigm during his sabbatical and resigned from Genentech. According to Human Resources documentation, during his exit interview, he was admonished about "the seriousness of his accepting other employment with another company while he was still employed at Genentech." Genentech explained to Allen

"that this action was a violation of the terms of our proprietary agreement." Genentech subsequently took steps to "deactivate all computer systems access for Allen Lam," telling the IT department to deactivate his systems access "immediately." Allen was further told that his actions impaired his ability ever to work for Genentech again. Allen "said he understood."

**D.    JHL Biotech, Inc. recruited Xanthe and Allen Lam to provide crucial assistance, including Genentech trade secrets, to aid its efforts to develop biosimilars of Genentech's medicines.**

125.    JHL is an aggressively expanding biotech company with significant venture capital support founded by former Genentech employees Racho Jordanov and Rose Lin. It is actively working to bring biosimilar products to market that will compete directly with Genentech's medicines.

126.    As set forth below, JHL knowingly solicited and accepted Xanthe's assistance in developing JHL products while she was working at Genentech. In her capacity as a JHL agent (and, through her husband's JHL stock holdings, part-owner of JHL), Xanthe provided JHL with critical information and support—including Genentech confidential, proprietary, and trade secret information—starting in 2013 and continuing through 2017 during a crucial development period for JHL's biosimilars of Genentech's Rituxan®, Pulmozyme®, Avastin®, and Herceptin® medicines, and JHL's efforts to create and validate biopharmaceutical manufacturing processes at its facilities.

**1.    Xanthe Lam downloaded and compiled scores of Genentech's confidential, proprietary, and trade secret documents for use at JHL.**

127.    Starting in or around May 2013, Xanthe began downloading and saving to her Genentech-issued laptop computer hundreds of confidential and proprietary Genentech documents that contained trade secret information concerning the four Genentech products JHL intended to mimic—Rituxan®, Pulmozyme®, Herceptin®, and Avastin®. These files included confidential "Pharmaceutical R & D Technical Reports," stability studies, mixing studies, degradation studies, validation reports, testing protocols, and other highly confidential reports, procedures, and analyses. The materials Xanthe downloaded and saved to her laptop correspond precisely with the biosimilar drugs JHL was developing.

128.    There is no legitimate work-related reason why Xanthe would have needed to compile this collection of information on her laptop computer.

129.    The improper nature of Xanthe's downloading activity is further confirmed by the manner in which she stored the documents.  She placed them in folders that she created on her laptop's hard-drive using a folder structure and nomenclature that makes clear that she compiled the confidential Genentech documents to help JHL's biosimilar development efforts.  For instance, her folders included the following: "Avastin_JHL," "Herceptin_JHL," "Pulmozyme_JHL," and "Rituxan_JHL."

130.    Additionally, Xanthe routinely saved internal JHL documents concerning the relevant JHL biosimilar in these folders alongside Genentech's confidential documents concerning the branded Genentech medicine.

131.    Xanthe's folder structure reveals the scope of her efforts to aid Genentech's competitor in its drug development activities.  To take but one example, the "Rituxan_JHL" folder contains the following sub-folders, among others:

a)    "1101_Form."  This subfolder is named for the product known as JHL 1101, which is JHL's biosimilar of Rituxan®.  The subfolder contains a series of folders and documents, including confidential Genentech Quality Control documents such as "Certificates of Analysis," Genentech's "Validation Master Plan Report" for Rituxan®, and Genentech's "Stability Protocol for Rituxan Drug Product."  It also contains a subfolder full of JHL Formulation Development Presentations (subfolder "JHL1101_Form_Dev"), which track JHL's efforts to replicate Genentech's Rituxan® medicine.

b)    "Assays."  This subfolder contains several confidential test protocols from Genentech's files.

c)    "Assays AVP & AVR."  This subfolder contains a trove of confidential "Assay Validation Protocols" and "Assay Validation Reports" from Genentech's files.

d)    "Rituxan Tech Reports."  This subfolder contains a host of confidential Technical Reports regarding Rituxan®, from Genentech's files.

e)    "Stability Protocol and CofA."  This subfolder contains several

confidential Stability Protocol documents for Rituxan® as well as Certificates of Analysis, from Genentech's files. The folder also contains JHL stability protocols for its Rituxan® biosimilar.

132. Xanthe's "Pulmozyme_JHL" folder likewise contains an array of confidential, proprietary, and trade secret Genentech documents, including subfolders entitled "Assay VP & VR," "Assays for DP release only," "Stability and Release Assays," and "DS & DP Stability Protocols & CofA." The folder also contains a subfolder called "JHL formulation protocol," which includes JHL formulation protocols—edited by Allen Lam—for its Pulmozyme® biosimilar. In another subfolder labeled "JHL1922", which refers to JHL's Pulmozyme® biosimilar named JHL 1922, there is a draft of a Stability Protocol for JHL 1922, in which "Xanthe Lam" inserted edits and comments including testing parameters copied verbatim from Genentech's confidential Stability Protocol for Pulmozyme®, a copy of which Xanthe had saved to her "Pulmozyme_JHL" folder. There is no valid, work-related reason why Xanthe should have been editing JHL documents using her Genentech computer (or any computer, for that matter), and no valid reason why she should have been storing highly sensitive formulation, testing, and analytical data regarding a Genentech medicine in the same folder as documents regarding a competitor's biosimilar for that medicine.

133. Xanthe's "Herceptin_JHL" and "Avastin_JHL" folders likewise contain an array of confidential, proprietary, and trade secret Genentech documents, including subfolders entitled "Assay VP & VR," "Assays," and "Stability Protocol & CofA." As is true of her "Rituxan_JHL" and "Pulmozyme_JHL" folders, there is no valid, work-related reason why Xanthe should have been compiling highly sensitive formulation, testing, and analytical data regarding Genentech products, much less storing them in folders labeled "JHL".

134. Xanthe's "Beigene (2109)" folder contains materials relating to JHL's formulation work with BeiGene on a product targeting the same pathway (anti-PD-L1) as Genentech's Tecentriq®. Xanthe downloaded those materials in April and July of 2015, when she was simultaneously serving as Genentech's Formulation Lead for Tecentriq® and had many highly confidential trade secret materials relating to development of Tecentriq® saved on her Genentech-issued laptop computer.

135.    Further, logs from Xanthe's Google Chrome download history reveal that she also used a personal Google Gmail account to download JHL files to her Genentech-issued laptop.

136.    The files located on Xanthe's laptop computer contain Genentech trade secrets. Genentech has not and does not disclose them to third parties—especially competitors or potential competitors. Some documents may be disclosed to the FDA in the course of regulatory submissions, but this is done on the express understanding that the agency will not disclose them to the public.

137.    The files located on Xanthe's laptop have significant commercial value to Genentech. They represent the culmination of hundreds of millions of dollars of investment in research and development, as well as significant amounts of employee time, laboratory work, and corporate resources.

**2.      Xanthe and Allen Lam worked directly for JHL on biosimilar formulation at the direction of Racho Jordanov and Rose Lin.**

138.    On information and belief, Allen Lam began working for JHL in or about June 2013.

139.    According to an email written by Xanthe Lam, at around that time, Allen Lam spent six weeks at JHL's facility in Taiwan, working "on analytical assay development and evaluation for biosimilars." In November 2013, Xanthe wrote to a friend that "Allen has joined the company [JHL] and spent sometime [sic] there."

140.    Allen is listed as a pre-IPO investor in JHL.

141.    Allen appears as a co-author of several internal JHL Formulation Development presentations, dating from January 2014 to April 2015. Xanthe maintained copies of these documents on her Genentech-issued laptop computer. The metadata for several of these JHL presentations lists "Xanthe Lam" as the author.

142.    In late September 2013, Defendants Racho Jordanov and Rose Lin emailed Xanthe Lam at her personal email address to offer her a consulting job for JHL. Xanthe responded shortly thereafter indicating that she would come to Taiwan to start her consulting work for JHL in December 2013 in conjunction with JHL's grand opening ceremony scheduled for December

5, 2013. Xanthe also exchanged messages with Lin and Jordanov about the number of weeks that Xanthe would spend in Taiwan, and Xanthe indicated to them that it would depend on her ability to find someone to cover for her on her ongoing projects for Genentech. Xanthe, Lin, and Jordanov also discussed the raw materials and equipment that Xanthe would need to conduct formulation work on two of JHL's biosimilars, JHL 1101, designed to mimic Rituxan®, and JHL 1188, designed to mimic Herceptin®.

143.    Before, during, and after this period, Racho Jordanov, Rose Lin, and JHL knew that Xanthe was employed by Genentech. On information and belief, in September 2013, Jordanov and Lin invited Xanthe via her personal email to come and work in-person on formulation in JHL's lab in Taiwan; Xanthe told them she would come for several weeks in December if she could find someone to cover her duties at Genentech.

144.    On October 11, 2013, Xanthe forwarded the announcement of her Genentech promotion to Principal Scientist to her friend Kim Chan, a professor at the University of Sydney. She also offered to help Professor Chan's son, Defendant John Chan, secure a job at Genentech. In subsequent correspondence with Professor Chan, Xanthe described Allen Lam's role at JHL, and also stated that she "will go with him in December," arriving in Taipei on December 2, 2013. Xanthe further explained: "I will spend 4 weeks at JHL Biotech o[n] my sabbatical until Dec. 30."

145.    In an October 27, 2013 email to her niece, Xanthe stated, "I will be taking my sabbatical leave from my company this December (Dec. 2-31st) and *joining a biotechnology company in Taiwan* as a Visiting Scientist for one month." (emphasis added).

146.    In truth, Genentech HR records make clear that Xanthe took no such "sabbatical" from Genentech in December 2013. Xanthe appears not to have informed her superiors or coworkers that the purpose of her trip to Taiwan was to work at JHL as a "Visiting Scientist," or in any other capacity. On the contrary, she repeatedly described her trip internally as a "vacation," during which she was "traveling in Asia." That was false. In fact, Xanthe used her time off to work directly for a competitor, armed with the trove of documents she had misappropriated containing Genentech confidential, proprietary, and trade secret information.

147.    When discussing her month-long absence from Genentech with her supervisors or colleagues—during a crucial period for JHL's biosimilar development efforts—she made no mention whatsoever of her or her husband's role at JHL.  Her silence on the matter speaks volumes; her work at JHL was in flagrant violation of her Proprietary Information Agreement, Genentech's Code of Conduct, and the law.

148.    On October 29, 2013, Xanthe sent herself a file from her Genentech email address to her personal email address, with the subject "Formulation."  The email attached a JHL presentation entitled "JHL 1101.ppt," which concerned JHL's efforts to create a Rituxan® biosimilar.

149.    On December 2, 2013, Xanthe used her Genentech-issued laptop computer to create a document entitled "JHL Formulation strategy.doc."  Although the document's metadata lists "Genentech" as its author, it clearly concerns formulation strategy regarding JHL products, not Genentech products.

150.    The JHL Formulation strategy document lists three JHL products: "JHL 1101," "JHL 1921," and "JHL 1188."  As noted, JHL 1101 refers to a proposed biosimilar for Genentech's Rituxan® medicine.  On information and belief, the second product, JHL 1921 refers to a proposed biosimilar for Genentech's Pulmozyme® medicine.

151.    In her JHL Formulation strategy document, Xanthe appears to plot out how she will aid JHL in developing a Rituxan® biosimilar.  After noting that "[o]pportunity exists for improvement," Xanthe set forth her three-step plan to "[i]mplement improved IV liquid formulation ASAP."  First, she would "[i]nitiate formulation screening" during the week of December 2, 2013.  Second, she would "[s]elect potential formulation based on a 3-month accelerated and stressed stability study."  Third, she would "[c]onfirm selected formulation by freeze/thaw study, agitation study, concentration dependent study and long-term real time stability study."

152.    Xanthe traveled to Taiwan on or about December 2, 2013, to work at JHL.

153.   Xanthe was present at a grand opening of JHL's manufacturing facility in Taiwan on December 5, 2013, and was photographed raising a glass alongside Racho Jordanov, Rose Lin, and Allen Lam, among others:



*Allen and Xanthe Lam (first and second from right), toast the grand opening of JHL's manufacturing facility in Taiwan alongside Racho Jordanov and Rose Lin (first and second from left)*

154.   Date and location metadata embedded in the photographs found on Xanthe's devices confirm they were taken at JHL's headquarters and elsewhere in Taiwan on December 5, 2013.

155.   Coincidentally, on December 4, 2013, a paralegal in Genentech's legal department emailed Xanthe to discuss imaging her computer in response to a litigation hold notice for an unrelated legal matter. Xanthe responded that the imaging would need to wait until she returned from her "vacation in Asia." The paralegal responded, "Is the computer [] with you in Asia?" Making no mention of the Genentech-issued laptop computer on which she had stored hundreds of confidential Genentech and JHL documents, Xanthe replied, "No. I have a desktop computer." Xanthe's desktop computer was imaged upon her return from Taiwan. The laptop computer that Xanthe concealed from the paralegal was not imaged at that time.

156.   In truth, Xanthe did have her Genentech-issued laptop computer with her in Taiwan—the same laptop on which she had downloaded and organized Genentech trade secret information within JHL-labeled folders. An analysis of that laptop has revealed that Xanthe connected it to JHL's Wi-Fi network on or about December 26, 2013.

157.    While in Taiwan, Xanthe went about her work as a JHL employee and agent, assisting JHL's formulation and analytical development efforts. Jordanov and Lin worked closely with Xanthe during that time, attending meetings together on formulation strategy for JHL's biosimilars of Genentech's Rituxan®, Pulmozyme®, and Herceptin® medicines. Throughout December 2013, they also exchanged email messages with Xanthe (all on Xanthe's personal email account) concerning the formulation strategy for these products.

158.    On December 17, 2013, Xanthe emailed her friend, Professor Kim Chan, at the University of Sydney, to enlist his help in developing a biosimilar of Genentech's Pulmozyme® product for JHL. After posing a few technical questions about the drug's formulation, Xanthe suggested that Professor Chan enter into a consulting agreement with JHL to help develop its Pulmozyme® biosimilar. When Professor Chan responded with the requested information, Xanthe told him to expect a contact from Racho Jordanov and Rose Lin directly, adding, "Although JHL is a very small start-up biotech in Taiwan, but [sic] they got a lot of money from the investors (USD $40M so far). Don't let them take the advantage of getting information and service for free (they always do)."

159.    On December 21, 2013, Professor Chan's son, John Chan, emailed Xanthe to ask for her help in securing a job at JHL. The two then discussed over email employment possibilities at both Genentech and JHL. On December 24, 2013, Xanthe emailed John Chan about JHL. She told him that she had to "go to the lab to coach and help" with JHL's formulation efforts, and that she was effectively in charge of JHL while the company's executives were in the United States for the holidays:

> **I have been at JHL as a consultant on formulation development since Dec. 1st, my last day is this Friday, 12/27.** Therefore, I have been out of my office at Genentech for almost a month and have no no [sic] idea if there is any opening in my department or the drug delivery group. I will update you the chance of having a job at Genentech when I return to work after the New Year.
>
> The chance for you to have a job at JHL may be higher if you don't mind the salary. They are still hiring. I think they need more people working on formulation (so far there is only one person). **I have to go to the lab to coach and help. All the senior people are back in the US for the holidays and I am the only one left behind to [be] in charge of the company this week.** They have no Christmas day off (I have to go to work tomorrow, Dec. 25th).

40

(emphasis added).

160.    Xanthe returned to Genentech on or about January 2, 2014. Her work for JHL, however, continued unabated. On February 13, 2014, Xanthe emailed John Chan to let him know that she had asked JHL to create a position of "formulation scientist" for him.

161.    Chan ultimately had a telephone interview with Rose Lin on February 20, 2014, during which they discussed salary, bonus, stock options, holidays, and so on. When reporting back to Xanthe about the interview, Chan wrote that his "[w]orking arrangement and role[]" would be "Formulation under you and Allen's guidance (*presumably I will be your direct report*)." (emphasis added). He added, "*Importantly, Rose asked if you could perform a formal interview with me and send her a report.*" *Id.* (emphasis added). Again, at this time, Xanthe was employed as Principal Scientist at Genentech.

162.    JHL offered Chan the position on March 4, 2014. After consulting with Xanthe about the offer, Chan accepted it.

163.    Xanthe informed Chan that she and Allen Lam had already negotiated a salary increase for Chan, which would become effective after six months of employment. She also told Chan that the 10,000-30,000 stock options JHL had offered him was a "generous" amount (comparable to the 20,000 Allen Lam received), noting that the options "will be worth a lot of money when it becomes IPO."

164.    According to Chan's resume (a copy of which was found stored on Xanthe's Genentech-issued laptop computer), he was a "Project Manager + Scientist" at JHL from May 2014 to May 2015, and a "Project Lead + Group Leader" from June 2015 to at least July 2016. Ex. A. Chan describes his role at JHL as "head of the Pulmozyme® biosimilar project."

165.    Shortly after Chan took the position at JHL, Xanthe began holding frequent conversations with him via Skype. Skype logs indicate that she spoke with Chan via Skype nearly every week for over a year between May 2014 and August 2015, and then continued to speak with him intermittently over Skype throughout 2016. This evidence comports with Chan's comment that he expected to be Xanthe's "direct report" regarding JHL's formulation efforts.

166.    On information and belief, during Xanthe's Skype calls with Defendant Chan,

Chan solicited, and Xanthe provided, Genentech's confidential, proprietary, and trade secret information for Chan's use in his role at JHL.

167.    For instance, in September 2014, Xanthe and Chan communicated via Skype weekly—on September 5th, 12th, 19th, and 25th.

168.    On September 29, 2014, Xanthe emailed her husband at his personal Gmail address. The subject line was "Tech report for John." On information and belief, "John" refers to Chan, who, according to his resume, was then-employed as "Project Manager + Scientist" at JHL and working on the "Pulmozyme® biosimilar project."

169.    Xanthe instructed her husband as follows: **"Make a hard copy of the report attached for John. Don't give him e-copy and tell him don't show it to others."** (emphasis added). The attachment was a confidential Genentech Technical Report with the filename "TR0467.pdf." This file is one of the Technical Reports found in Xanthe's "Pulmozyme_JHL" folder, which she appears to have saved to her hard-drive on or about August 27, 2014. The file is clearly labeled as "GENENTECH Pharm R & D Technical Report – CONFIDENTIAL." It is also clearly marked "Confidential" and "Internal Only" at the bottom of the cover page. The Technical Report concerns the stability and compatibility of Pulmozyme® with Stedim bags for storage, shipping, and handling.

170.    Upon receiving the confidential Technical Report, Allen Lam replied that the report appeared incomplete, having only 20 pages of 32. In response, Xanthe confirmed that the document was in fact complete. Her husband replied, "Great!! I have printed that out and will give it to John when he comes back tonight."

171.    During this same time period, it appears that JHL was researching the use of Stedim bags to store, transport, and handle its biosimilar products.

172.    In response to questioning during Genentech's internal investigation, Xanthe admitted that the Technical Report is a confidential Genentech document that should not have been disclosed or shared with anyone outside Genentech.

173.    Xanthe further admitted that she stopped having weekly Skype calls with John Chan because it was "too sensitive" and she didn't "want to get into trouble."

174.    Xanthe also stated that Racho Jordanov and Rose Lin took her and Allen Lam out to dinner to thank Xanthe for "educating" and "sharing science" with John Chan. According to Xanthe, when she informed Jordanov and Lin that she had stopped having weekly Skype calls with John Chan because she was worried it would get her into trouble, Jordanov said he understood the concern, in light of Xanthe's employment at Genentech.

175.    Xanthe's ongoing interactions with JHL personnel were not limited to her husband and Chan, however. Logs from Xanthe's Genentech-issued iPhone confirm that Xanthe was discussing JHL matters with Rose Lin, including a text messaging log reflecting several communications with Lin on April 23, 2015. Xanthe suggested using FaceTime to call Lin in Taiwan, and asked that Lin "[p]lease also read the email that Allen sent first." Upon information and belief, Xanthe was referring to an email Allen Lam sent Rose Lin on or about April 23, 2015 regarding Genentech's analytical methods for Rituxan® and their applicability to the stability testing and assay validation for JHL 1101. Xanthe's call log shows that Xanthe spoke with Rose Lin via FaceTime for 27 minutes later that same day, April 23, 2015.

E.    **The Trade Secrets at Issue**

176.    Because Genentech is asserting a claim under the California Uniform Trade Secrets Act, Civil Code Section 3426, *et seq*. ("CUTSA"), Genentech intends to file a statement pursuant to California Code of Civil Procedure Section 2019.201. That statement will describe, with reasonable particularity, the trade secrets currently at issue in this action.

177.    In general, the trade secrets at issue concern the following information:

a)    Genentech's validated proprietary analytical methods to test and ensure the stability, potency, purity, chemical composition and identity, and quality of its Pulmozyme®, Rituxan®, Avastin®, and Herceptin® medicines;

b)    Genentech's proprietary information regarding the development and selection of a formulation for Pulmozyme®, Rituxan®, Avastin®, Herceptin®, and Tecentriq®;

c)    The compilations of documents that Xanthe aggregated regarding Pulmozyme®, Rituxan®, Avastin®, and Herceptin®;

d)    Genentech's proprietary manufacturing and operations protocols, including

procedures for complying with regulatory GMP standards for manufacturing processes and facilities, safety standards, equipment calibration and validation methods, procedures for starting up a new manufacturing facility, maintenance procedures, and environmental control/anti-contamination procedures; and

e)      The compilation of documents that Quach downloaded regarding Genentech's manufacturing and operations protocols.

178.·  Each of these categories of information derives independent economic value from not being generally known to specialists in the biopharmaceutical field, and not being readily ascertainable through proper means by those who could obtain economic value from its disclosure or use.

179.   Genentech has taken reasonable measures to keep the information listed in paragraph 177 secret and confidential.

**F.      JHL Biotech, Inc. continues to gain an unfair and illegal advantage through use of Genentech trade secret information.**

180.   As set forth above, while JHL was working to formulate biosimilars of Genentech medicines, it received critical information through Xanthe, including Genentech confidential, proprietary, and trade secret information.  This information unquestionably gave JHL an unfair and illegal advantage, which catapulted it to rapid success.  Indeed, *just four years* after the company's founding, it entered into a deal with pharmaceutical giant Sanofi reportedly worth up to $236 million.  As one of JHL's investors told the media, "I think JHL may be the fastest biotech in history to go from scratch to an IPO [in Taiwan], in two and a half years."[15]

181.   JHL knows that Genentech, as the leader in biopharmaceuticals, possesses information that would be invaluable to JHL.  Indeed, JHL CEO Racho Jordanov has bragged about JHL's deep connections to Genentech (although not revealing its use of stolen trade secret information).  As Jordanov told one reporter in April 2016: "We have more than half a dozen [employees hired from Genentech].  JHL's process-development head for cell culture is from

---

[15] Shannon Ellis, *Early Stage I-Bridge Fund Seeks to Build 'New Drug Dream Factory' in China*, Dec. 16, 2015, http://www.bioworld.com/content/early-stage-i-bridge-fund-seeks-build-new-drug-dream-factory-china-0.

Genentech. The process-development head for purification, from Genentech. The vice president of manufacturing, from Genentech. Rose and I have 40 years together at Genentech. The head of quality is from Genentech. We have a team that has 200 years' experience."

182. Jordanov has repeatedly attempted to solicit confidential, proprietary, and trade secret information from current Genentech employees. For example, in March 2014, Jordanov used LinkedIn to ask a current Genentech employee for help finding "someone to help me with purification of dnase [Pulmozyme®]?" Realizing that Jordanov's request was out of bounds, the employee responded, "Seriously, Racho?! As a Genentech employee, why would I do that?" Similarly, in February 2013, Jordanov reached out to a different Genentech employee seeking a template for a cell line development service agreement. Jordanov has also repeatedly attempted to lure Genentech employees to JHL as JHL has progressed further towards commercializing its biosimilar drugs.

183. Lin has also repeatedly contacted current Genentech employees for help and advice regarding her efforts on behalf of Eusol and JHL, as well as to recruit Genentech employees to JHL.

184. JHL quickly raised more than $135 million in private investment and venture capital funding. Investors and financial backers include Kleiner Perkins Caufield & Byers, Sequoia Capital, Biomark Capital, Milestone Capital, Fidelity, and the China Development Industrial Bank. The company's stock was publicly listed on the Taiwan Emerging Stock Board (TPEx) on September 17, 2015.

185. On information and belief, JHL is currently and actively attempting to manufacture biosimilar pharmaceuticals that would compete directly with several of Genentech's marketed products. This includes biosimilars of Rituxan®, Pulmozyme®, Herceptin®, and Avastin®.

186. On February 14, 2016, JHL issued a press release touting the fact that European regulatory authorities had approved a clinical trial for its Rituxan® biosimilar.[16] In the press

---

[16] *See* PR Newswire, *JHL Biotech Receives Approval From European Authorities to Begin Biosimilar Clinical Trial*, Feb. 14, 2016.

release, Jordanov explained how difficult it is to re-create Genentech's Rituxan® medicine: "Countless international pharmaceutical companies have attempted to develop a rituximab biosimilar. Rituximab has a complex structure, and JHL had to develop a product identical in quality, safety, and efficacy to its Roche reference."[17]  Jordanov touted the relative speed with which JHL had accomplished the feat, saying "JHL is the first company from Greater China to receive European approval to conduct [a] biosimilar clinical trial" and hailed the clinical trial as "the beginning of an exciting new stage in JHL's growth."

187.    On or about December 5, 2016, JHL entered into a partnership with the French multinational pharmaceutical company Sanofi to produce and market a biosimilar to Genentech's Rituxan® therapy.  As reported by industry news sources, the deal "put Sanofi's commercial prowess behind JHL's in-development Rituxan copycat and, potentially, other drug candidates from the company."[18]  The deal between JHL and Sanofi is reportedly worth up to $236 million in upfront and milestone payments, with $21 million paid up front alongside an $80 million investment in JHL stock.[19]  Ex. F.

188.    The Sanofi pact was critical to JHL, with Jordanov calling it "a turning point in JHL's history."

189.    On information and belief, JHL continues to possess, use, and benefit from the Genentech confidential, proprietary, and trade secret information that Defendants misappropriated, currently possess on behalf of JHL, and have provided to other JHL personnel over the past several years.  JHL is using that information to unlawfully compete with Genentech, both in the biosimilar market and in its pursuit of novel molecules that compete directly with Genentech's medicines.

190.    In March 2017, JHL announced that the first European patient in a Phase I clinical trial of its Rituxan® biosimilar (JHL 1101) had been dosed, and recently reported on its website that as of March 2018, it has over 80 patients enrolled in that ongoing study.

---

[17] Roche refers to Genentech's parent company. *See supra* ¶ 43.

[18] Eric Palmer, *Sanofi, JHL Biotech Strike Rituxan Biosimilar Pact Worth Up To $236M*, FiercePharma, Dec. 5, 2015.

[19] PR Newswire, *Sanofi & JHL Announce Strategic Biologics Alliance in China*, Dec. 5, 2016.

191.    JHL has also made huge strides toward marketing biosimilars of three other Genentech medicines. On March 1, 2018, JHL became the first biosimilar manufacturer to receive regulatory approval to conduct clinical trials of a Pulmozyme® biosimilar. On April 16, 2018, JHL received approval to conduct Phase I trials of its Avastin® biosimilar in China. That trial comes in addition to JHL's ongoing Phase I trial of that product in Bulgaria, which European authorities authorized in February 2018, and its Phase III clinical trials of its Avastin® and Herceptin® biosimilars. In addition, in July 2018, JHL announced that it received regulatory approval to conduct its Phase I clinical trials of its Rituxan® biosimilar in China and its Phase III clinical trial of its Rituxan® biosimilar globally.

192.    JHL's dramatic rise to the top in the crowded field of aspiring biosimilar manufacturers has not gone unnoticed. In November 2017, JHL was named #19 on the Deloitte Technology Fast 500™ Asia Pacific" List, which recognizes "the fastest growing Asia Pacific companies in the life sciences, software and hardware tech sectors."

193.    On February 1, 2018, JHL announced that it would voluntarily delist its shares from TPEx, in order to more effectively "pursue its planned expansion activities and to explore various fundraising strategies (including potentially listing on an overseas exchange)." JHL Biotech, Inc. *JHL Biotech Shareholders Vote to Voluntarily Delist from Taiwan Exchange*, PR Newswire, Feb. 1, 2018.

**G.      In mid-2017, JHL accessed Genentech's secure document control system through its agent, James Quach, who stole a large set of documents containing confidential, proprietary, and trade secret information.**

194.    In mid-2017, the conspiracy to misappropriate Genentech's trade secrets expanded to include Defendant James Quach, who—with Xanthe's assistance—obtained unauthorized access to Genentech's password-protected systems for the specific purpose of downloading hundreds of highly sensitive Genentech manufacturing protocols, procedures and other documents, and absconded with them to Wuhan, China, where he took a job in JHL's manufacturing facility.

195.    On or about April 4, 2017, Defendant Quach was fired from Genentech for unacceptable performance. Concurrent with his termination, Quach's authorization to use

1  Genentech's computer network was revoked and his access deactivated.

2      196.    On or about May 6, 2017, Quach emailed Xanthe a copy of his resume from his

3  personal email account, saying, "I am very interested in Roslyn's project and any other job

4  opportunities. I hope I spell [sic] her name right." Xanthe responded that same day, asking

5  Quach to call her for more information "about the job openings at JHL Biotech." She also

6  clarified, "[m]y friend's name is called [sic] Rose Lin," referring to the co-founder of JHL.

7      197.    With Xanthe's advice and support, Quach sought out and was hired for a position

8  at JHL's facility in Wuhan, China.

9      198.    Shortly before departing for this new role, Quach arranged with Xanthe to use her

10  login credentials to access Genentech's document control system, Condor, for the purpose of

11  downloading numerous documents containing Genentech's confidential, proprietary, and trade

12  secret information to take with him to JHL.

13      199.    On three separate occasions, on or about July 9, July 16, and July 26, 2017, Quach

14  went to Xanthe's home in South San Francisco, California and, with Xanthe's knowledge and

15  consent, used Xanthe's credentials to access Condor and download files onto a personal USB

16  drive.

17      200.    The files Quach downloaded comprise Genentech's procedures for complying with

18  regulatory GMP standards. Genentech developed these detailed specifications through years of

19  analysis and testing, and kept them strictly confidential. These documents would provide a

20  lucrative shortcut for a competing biopharmaceutical manufacturer such as JHL to gain regulatory

21  approval for their manufacturing and quality assurance processes, and to gain a leg up on its

22  competitors in the biosimilar industry.

23      201.    Quach's role at JHL involved managing engineering and validation activities

24  during the start-up phase of JHL's Wuhan manufacturing facility. A critical component of this

25  role was developing procedures and specifications for the Wuhan facility to comply with GMP

26  standards.

27      202.    On information and belief, Quach took Genentech's confidential, proprietary, and

28  trade secret information with him to Wuhan for JHL's benefit.

203. On information and belief, upon arriving at JHL's facility in China, Quach determined that he needed additional Genentech documents. He therefore emailed Xanthe using his personal email account, and asked her to download and send him certain additional documents from Genentech's computer system. Xanthe did as Quach requested.

**H.   The Lams improperly aided several other Genentech competitors apart from JHL.**

204. The Lams' more recent efforts on behalf of Genentech's competitors are not limited to JHL. In June 2012, two long-time friends of Xanthe—Jui-Lien Huang and Jeng Her—founded AP Biosciences ("APBio"). APBio secured Series A funding in April 2013.

205. A presentation saved to Xanthe's Genentech-issued laptop computer in August 2016 entitled "APBio antibody library & biologic pipeline for Genentech" sets forth APBio's plan to develop novel (as opposed to biosimilar) products, including one targeting anti-PD-L1, the same target as Genentech's Tecentriq® medicine.

206. Although Xanthe's direct involvement with APBio appears to have begun in 2016, Xanthe had discussed potential business and consulting opportunities with both of the APBio founders (Mr. Her and Ms. Huang) for many years. And throughout that time, Mr. Her well understood that Xanthe was employed at Genentech, and that therefore it would be improper for her to help him compete with Genentech.

207. Without mentioning her connection to APBio, Xanthe introduced APBio to Genentech's business development unit in an attempt to secure a partnership between the two companies. Genentech opted against working with APBio since the two companies were directly competing with one another. Upon hearing that Genentech had declined to work with APBio, Xanthe wrote to Mr. Her that "[d]eveloping in-house antibodies is much more rewarding. *With the pharmaceutical knowledge and experience that Allen and I have, we can assist and support AP Biosciences to achieve this goal.*" (emphasis added). Mr. Her responded, "*The help you and Allen may provide to us would be essential to success of the programs.* We are going to set up animal models once we secure some Series B funding." (emphasis added). When he sent this email, Mr. Her knew that Xanthe worked at Genentech.

Case 3:18-cv-06582   Document 20   Filed 10/30/18   Page 0 of 73

208.    The next week, on or about September 23, 2016, APBio circulated a new version of its introductory presentation to another potential partner company.  That presentation expressly identified Xanthe as an APBio "Consultant" on the company's "Leadership" team and touted Xanthe's lead role in formulating Genentech's medicine Tecentriq®.

209.    Xanthe's relationship with APBio continued into 2017 when Ms. Huang and Mr. Her recommended Xanthe and Allen as consultants to APBio's partner/investor OBI.  OBI consulted with Xanthe about results of stability studies for one of its leading product candidates in June 2017, while Xanthe remained employed at Genentech.

**I.    Xanthe and Allen Lam's improper and illegal work for Genentech competitors pre-dates their work for JHL.**

210.    Although the Lams' efforts to conspire with and provide Genentech trade secrets to Genentech's competitors reached its zenith when they worked as agents for JHL between 2013 and 2017, the Genentech internal investigation that uncovered their work for JHL also revealed that it was the latest episode in a pattern of improper and unethical conduct.  Indeed, their misconduct dates back at least to 2009.

211.    In or about August 2009, Xanthe and Allen began to investigate ways to make more money, including through consulting work and other employment, even though Xanthe continued to be employed by Genentech.  Xanthe and Allen pursued these opportunities with competing biotech companies in knowing violation of Xanthe's obligations under the GGOP, Code of Conduct, and her Proprietary Information Agreement.

212.    In November 2009, Xanthe asked a longtime friend for advice regarding how much to charge in consulting fees for both short and long-term projects.

213.    Also in late 2009 and early 2010, Xanthe and Allen Lam began communicating with several individuals, including Defendant James Quach, regarding efforts to form their own biotech company.  The proposed company would provide contract testing and consulting services regarding "Formulation Development, Method Development, Analytical Testing, Stability Testing," among other areas, and would be called "APX BioServ, LLC."  APX was to have a "double meaning," referencing both the Asia-Pacific biotech industry as well as the names of the

1   company's founders—with "A" for Allen and "X" for Xanthe.  Xanthe suggested trying to

2   incorporate the letter "J," as well, for James (Quach) and Jui-Lien (Huang).  In discussing who

3   might sit on the new company's board of directors, Ms. Huang (who later co-founded APBio),

4   understood and expressed that she could not list Xanthe as a board member due to Xanthe's

5   "conflict of interest" in light of her employment at Genentech.

6        214.    Xanthe also worked for established biotech firms while employed at Genentech.

7   In December 2009, Xanthe and Allen Lam traveled together to Taiwan, in part to visit Genentech

8   competitor Eusol Biotech Co., Ltd. ("Eusol").

9        215.    Eusol is a Taiwanese biotechnology company focused on developing treatments

10  for spinal cord and peripheral nerve injuries.  In 2009 and 2010, Rose Lin was Eusol's plant

11  manager.

12       216.    Between December 2009 and May 2010, Xanthe downloaded to her Genentech-

13  issued computer hundreds of confidential, proprietary, and trade secret Genentech documents that

14  would be helpful to Eusol's formulation efforts.  Xanthe organized those documents, alongside

15  Eusol documents, in folders and subfolders on her computer.

16       217.    In May 2010, the Lams returned to Taiwan so that they could both consult for

17  Eusol.  Between May 11 and 28, 2010, Xanthe provided "[o]n-site consulting services" to Eusol.

18  Xanthe hid these activities from her supervisors and colleagues at Genentech, falsely stating that

19  she was traveling to Taiwan for a "vacation."

20       218.    After the Lams returned from Taiwan in May 2010, they continued to consult for

21  Eusol.  Indeed, Xanthe stated in email correspondence that Eusol employees sent her and Allen

22  "questions via email every week."

23       219.    Also in May 2010, Rose Lin invited Xanthe to give "a presentation of

24  formulation" at Taiwan's Development Center for Biotechnology ("DCB"), which is a Taiwanese

25  preclinical research and service institute for biopharmaceutical development.  Lin understood that

26  Xanthe worked for Genentech at the time she extended the invitation.

27       220.    Xanthe understood that giving the DCB presentation violated Genentech policy.

28  On May 5, 2010, Xanthe emailed one of her interlocutors in Taiwan to request that she not tell

Xanthe's supervisor at Genentech about the presentation. Xanthe explained that she had not had "time to go through the approval process for presenting outside Genentech." It was agreed that the presentation would be kept secret from Genentech. Xanthe also informed a friend about the presentation, adding "[p]lease don't forward to anyone."

221. On May 7, 2010, before leaving for Taiwan, Xanthe used her Genentech email account to send Allen two documents, both entitled "DCB presentation." Xanthe instructed Allen to download the documents.

222. Xanthe gave the presentation on May 14, 2010, and received a "speech fee."

223. Around the same time period, Xanthe and Allen Lam also began consulting for Genentech competitor Mycenax Biotech, Inc. ("Mycenax"). Mycenax is a Taiwanese company focused on developing and manufacturing biologics.

224. Mycenax has worked on developing drugs that are biosimilar to various Genentech medicines, including Avastin®, Herceptin®, and Actemra®.

225. In December 2010, the Lams entered into a consultancy agreement with Mycenax under which they were to provide services relating to "chemistry, manufacturing, and control as these apply to the manufacture and quality of biopharmaceuticals."

226. Also in December 2010, the Lams entered into a confidentiality agreement with Mycenax regarding its "development of biopharmaceuticals." The Lams also helped Mycenax to locate a lab in the United States.

227. Xanthe created various Mycenax-related folders on her Genentech-issued computer. The folders included Genentech's confidential, proprietary, and trade secret information, which she stored alongside Mycenax documents and test results.

228. On information and belief, Xanthe and Allen continued to consult for Mycenax through at least December 2014, and provided Mycenax with Genentech's confidential, proprietary, and trade secret information during that time.

**J.** **Xanthe attempted to cover the tracks of her work for competitors.**

229. Xanthe knew full well that her conduct was unlawful and inappropriate. She frequently asked her non-Genentech colleagues not to forward her emails, not to discuss certain

1   matters with Genentech, or to communicate with her through her personal email rather than her

2   Genentech email.

3       230.   Logs obtained from Xanthe's Genentech-issued laptop computer reveal that she

4   frequently used a web-browser to access her personal email accounts, and downloaded JHL (and

5   APBio) related files using one or more of her personal Gmail accounts.

6       231.   Most tellingly, Xanthe appears to have deleted many of the files she stored on her

7   Genentech laptop computer in order to prevent Genentech from knowing she had them.  Logs

8   obtained from her laptop's automatic back-up program show that on or about January 31, 2017,

9   Xanthe's laptop contained folders for JHL, Eusol, and Mycenax, as well as files relevant to

10  APBio.  In mid-March 2017, however, Xanthe needed her laptop repaired due to a battery

11  problem.  She contacted Genentech's IT department and requested either a repair or a new

12  computer.  Genentech's IT department provided Xanthe with a new laptop computer.  In the

13  process, Xanthe provided Genentech's IT department with her old laptop computer—the same

14  machine that she had taken with her to Taiwan during her on-site stint at JHL, and which

15  contained the confidential, proprietary, and trade secret information alleged herein.

16      232.   Genentech performed a forensic analysis of Xanthe's old laptop computer.  Upon

17  doing so, Genentech found that all of the folders and files relating to the misconduct described

18  herein had been deleted prior to Xanthe's returning the laptop computer to Genentech.

19  **K.**   **Defendants acted with oppression and malice in a willful attempt to harm**
        **Genentech.**

20

21      233.   As set forth above, Defendant JHL acted with oppression and malice, knowingly

22  accepting and using Genentech's confidential, proprietary, and trade secret information for its

23  own benefit.

24      234.   As set forth above, Defendants Racho Jordanov and Rose Lin are officers,

25  directors, and managing agents of JHL, serving as JHL's President/CEO and General Manager,

26  respectively.

27      235.   Jordanov and Lin had advance notice that Xanthe was unfit to work for and

28  provide assistance to JHL in light of her ongoing employment at Genentech.  Nonetheless, JHL

1  employed Xanthe in conscious disregard of Genentech's rights.

2      236.    Jordanov and Lin authorized and ratified Xanthe's wrongful conduct alleged

3  herein.

4      237.    As set forth above, Defendant Xanthe Lam acted with oppression and malice,

5  knowingly violating her duty of loyalty to Genentech, and knowingly misappropriating

6  Genentech's confidential, proprietary, and trade secret information for her own benefit, and the

7  benefit of her co-Defendants.

8      238.    As set forth above, Defendant Allen Lam acted with oppression and malice,

9  knowingly aiding Xanthe as she violated her duty of loyalty to Genentech, and knowingly

10  misappropriating Genentech's confidential, proprietary, and trade secret information for his own

11  benefit, and the benefit of his co-Defendants.

12      239.    As set forth above, Defendant Racho Jordanov acted with oppression and malice,

13  knowingly misappropriating Genentech's confidential, proprietary, and trade secret information

14  with the assistance of Xanthe and Allen Lam for his own benefit and the benefit of JHL.

15  Specifically, Jordanov solicited Genentech's confidential proprietary, and trade secret information

16  from Xanthe despite the fact that he knew she was employed by Genentech and knew that she

17  was bound by a duty of confidentiality to Genentech. Defendant Jordanov also had advance

18  notice that Xanthe was unfit to work for and provide assistance to JHL in light of her ongoing

19  employment at Genentech.  Nonetheless, he solicited and retained the services of Xanthe in

20  conscious disregard of Genentech's rights.

21      240.    As set forth above, Defendant Rose Lin acted with oppression and malice,

22  knowingly misappropriating Genentech's confidential, proprietary, and trade secret information

23  with the assistance of Xanthe and Allen Lam for her own benefit and the benefit of JHL.

24  Specifically, Lin solicited Genentech's confidential proprietary, and trade secret information from

25  Xanthe despite the fact that she knew Xanthe was employed by Genentech and knew that Xanthe

26  was bound by a duty of confidentiality to Genentech. Defendant Lin also had advance notice that

27  Xanthe was unfit to work for and provide assistance to Eusol and JHL in light of her ongoing

28  employment at Genentech.  Nonetheless, she solicited and retained the services of Xanthe first on

behalf of Eusol, and then JHL, in conscious disregard of Genentech's rights.

241.    As set forth above, Defendant John Chan acted with oppression and malice, knowingly misappropriating Genentech's confidential, proprietary, and trade secret information with the assistance of Xanthe and Allen Lam for his own benefit and the benefit of JHL. Specifically, Chan solicited Genentech's confidential proprietary, and trade secret information from Xanthe despite the fact that he knew she was employed by Genentech and knew or should have known that she was bound by a duty of confidentiality to Genentech.

242.    As set forth above, Defendant James Quach acted with oppression and malice, knowingly misappropriating Genentech's confidential, proprietary, and trade secret information with the assistance of Xanthe for his own benefit and the benefit of JHL.  As a former Genentech employee and a signatory of Genentech's Proprietary Information Agreement, Quach knew that Xanthe was not authorized to provide him access to Genentech's document control system and that the information on that system constituted Genentech trade secrets.  He nonetheless solicited and received access to that system through Xanthe and used it to steal highly valuable information on JHL's behalf.

**L.      Genentech discovered Xanthe's unlawful and improper activities in October 2016, and immediately investigated and worked with law enforcement authorities to protect its property and obtain evidence necessary for legal action.**

243.    Defendants' unlawful conduct is continuous and ongoing.  Without prompt relief, Genentech will continue to suffer harm from Defendants' possession and use of Genentech's confidential, proprietary, and trade secret information.

244.    Genentech first received notice of the allegations described herein on or about October 11, 2016, via a tip received from a Genentech employee who was concerned that Xanthe was engaged in improper consulting activities outside of Genentech.

245.    Specifically, the employee forwarded to a manager the APBio slide deck referenced in paragraph 208 above, which listed Xanthe as a "Consultant" and part of the company's "Leadership."  The slide deck further described Xanthe as a "Principle [sic] scientist at Genentech" who was "[i]n charge of many pre-clinical antibody development projects,

1  including MPDL3280A." MPDL3280A is another name for Genentech's medicine, Tecentriq®.

2  246.  Prior to that confidential tip, Genentech had no reasonable basis to investigate

3  Xanthe or her improper activities.

4  247.  Genentech's Healthcare Compliance Office ("HCO") launched an internal

5  investigation. The investigation involved interviewing relevant Genentech personnel and

6  collecting and monitoring Xanthe's email and electronic files, among other things. The

7  allegations set forth herein are derived in large part from that internal investigation.

8  248.  Genentech also promptly notified the U.S. Attorney's Office, which launched its

9  own independent criminal investigation. Genentech cooperated fully with that investigation,

10  but—at the government's request—was careful not to alert Xanthe or any of her co-conspirators

11  to the investigation as it proceeded. Accordingly, Genentech refrained from taking immediate

12  employment action against Xanthe. Instead, Genentech allowed her to continue her employment,

13  while Genentech closely tracked and reviewed her emails, downloads, and electronic files.

14  249.  In August 2017, Genentech's investigation revealed suspicious downloading

15  activity under Xanthe's account. Unbeknownst to Genentech, Xanthe had granted James Quach

16  access to Genentech's network, and he was downloading hundreds of confidential files from

17  Genentech's secure repository.

18  250.  Responding to a duly issued government subpoena, Genentech provided evidence

19  related to those downloads to the U.S. Attorney's Office.

20  251.  Shortly after that, on September 11, 2017, the Federal Bureau of Investigation

21  executed a search on the Lams' home and interviewed Xanthe. That same day, Genentech

22  informed Xanthe of its investigation into her misconduct.

23  252.  Throughout law enforcement's involvement in the conduct at issue here,

24  Genentech has cooperated with the FBI and the United States Attorney's Office for the Northern

25  District of California to ensure that their criminal investigation would not be jeopardized by the

26  filing of this lawsuit. Genentech, therefore, has refrained from filing this complaint until now.

27  **M.**  **Xanthe has admitted to the vast majority of the allegations contained in this complaint.**

28  253.  On September 11, 2017, Xanthe voluntarily met with Genentech's counsel at

Genentech's headquarters to discuss the matters revealed in Genentech's internal investigation. Wishing to provide further information to Genentech, Xanthe requested an additional meeting with Genentech, which took place at Genentech's headquarters on September 18, 2017.

254.   Xanthe admitted to many of the allegations contained in this complaint. Among other things, she admitted that:

a)   She used her "sabbatical" to travel to JHL in December 2013, and that she worked in JHL's lab while there.

b)   She worked closely with John Chan while he was employed at JHL, holding weekly Skype calls with him for over a year, during which time she "coached" him in his role as JHL's formulation scientist.

c)   She ultimately stopped having video conferences with John Chan because it was too "sensitive" and she didn't want to "get in trouble."

d)   She saved Genentech documents to personal external storage devices, and then emailed them from home using her personal email account.

e)   She created folder directories on her Genentech-issued computer, organized by product, which contained Genentech confidential, proprietary, and trade secret information alongside JHL documents.

f)   The Genentech documents she downloaded and stored contain confidential, proprietary, and trade secret information that Genentech would never share with a competitor.

g)   She invited James Quach to her home on three separate occasions in July 2017, during which visits she (i) improperly granted him access to Genentech's Condor system in violation of Genentech's Code of Conduct; and (ii) allowed Quach to download and save a massive number of confidential Genentech documents relating to Genentech's manufacturing protocols onto an external hard-drive shortly before he left for JHL's manufacturing plant in China.

255.   Genentech terminated Xanthe for gross misconduct on October 13, 2017.

**N.   James Quach admitted to improperly downloading confidential Genentech information after he had left the company.**

256.   On October 6, 2017, Defendant James Quach voluntarily met with Genentech's

1    counsel to discuss the matters revealed in Genentech's internal investigation.  Quach admitted to

2    many of the allegations contained in this complaint. Among other things, Quach admitted that:

3          a)    He accepted a position at JHL before July 2017;

4          b)    He visited Xanthe's home on three separate occasions in July 2017, during

5    which visits he used Xanthe's credentials to access and download Genentech documents;

6          c)    Xanthe logged into the Genentech system, and Quach then selected

7    documents to download, including confidential validation and process documents;

8          d)    Quach saved the documents to a personal thumb-drive;

9          e)    Quach knew the documents he accessed and downloaded using Xanthe's

10    account were confidential and sensitive;

11          f)    Quach traveled to Wuhan, China to work in JHL's manufacturing facility

12    starting in August 2017; and

13          g)    Once Quach arrived at JHL, he decided he needed additional Genentech

14    documents.  He emailed Xanthe using his personal email account and asked her to download

15    certain documents from Genentech's system and send them to him.  Xanthe did as Quach

16    requested.

**O.    The United States Government has indicted Xanthe Lam, Allen Lam, John Chan, and James Quach.**

257.    On October 25, 2018, the United States Government indicted Defendants Xanthe

Lam, Allen Lam, John Chan, and James Quach for Theft of Trade Secrets, 8 U.S.C. § 1832,

violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Aiding and Abetting under

18 U.S.C. § 2, Criminal Forfeiture under 18 U.S.C. §§ 982, 1030, 1834, and 2323, and conspiracy

charges relating to the trade secret theft and computer fraud charges.

258.    Those charges are now pending in the U.S. District Court for the Northern District

of California. *See United States v. Lam et al.*, Case No. 18-527 (N.D. Cal. Oct. 25, 2018).

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act**

**(18 U.S.C. § 1836, *et seq.*)**

**Against All Defendants**

259.    Genentech repeats and incorporates by reference all prior allegations of this Complaint as if fully set forth herein.

260.    Genentech owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.

261.    Genentech has taken reasonable measures to keep such information secret and confidential.

262.    This confidential, proprietary, and trade secret information relates to products and/or services used, sold, shipped or ordered in, or intended to be used, sold, shipped or ordered in, interstate or foreign commerce.

263.    This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

264.    Genentech's confidential, proprietary, and trade secret information was made available to Defendant Xanthe Lam during her employment with Genentech under circumstances requiring her to maintain the information in confidence.  The other Defendants acquired Genentech's confidential, proprietary and trade secret information from or through Xanthe, and knew or had reason to know that the information was acquired by improper means.

265.    Defendants misappropriated Genentech's confidential, proprietary and trade secret information for their own benefit in the improper and unlawful manner alleged herein.  Each Defendant committed acts in furtherance of their misappropriation on or after May 11, 2016.  On information and belief, Defendants remain in improper and unlawful possession of Genentech's confidential, proprietary, and trade secret information.

266. As a direct and proximate result of Defendants' misappropriation of Genentech's confidential, proprietary, and trade secret information, Genentech has suffered and, if Defendants' conduct is not enjoined, will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

267. As a further direct and proximate result of Defendants' misappropriation of Genentech's confidential, proprietary, and trade secret information, Defendants have been or will be unjustly enriched in an amount to be proven at trial.

268. Defendants' misappropriation of Genentech's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

269. Genentech has been damaged by Defendants' misappropriation of its confidential, proprietary, and trade secret information, and is entitled to its damages, in an amount to be determined at trial, as well as an award of exemplary damages and attorneys' fees.

270. Because Genentech's remedy at law is inadequate, Genentech is further entitled to, preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests.

## SECOND CAUSE OF ACTION

**Misappropriation of Trade Secrets in Violation of the California Uniform Trade Secrets Act**

**(Cal. Civ. Code § 3426, *et seq.*)**

**Against All Defendants**

271. Genentech repeats and incorporates by reference all prior allegations of this Complaint as if fully set forth herein.

272. Genentech owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.

273. Genentech has taken reasonable measures to keep such information secret and confidential.

274. This confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of

the information.

275.   Genentech's confidential, proprietary, and trade secret information was made available to Defendant Xanthe Lam during her employment with Genentech under circumstances requiring her to maintain the information in confidence.  The other Defendants acquired Genentech's confidential, proprietary and trade secret information from or through Xanthe, and knew or had reason to know that the information was acquired by improper means.

276.   Defendants misappropriated Genentech's confidential, proprietary and trade secret information for their own benefit in the improper and unlawful manner alleged herein.  On information and belief, Defendants remain in improper and unlawful possession of Genentech's confidential, proprietary, and trade secret information.

277.   As a direct and proximate result of Defendants' misappropriation of Genentech's confidential, proprietary, and trade secret information, Genentech has suffered and, if Defendants' conduct is not enjoined, will continue to suffer, irreparable injury and significant damages, in an amount to be proven at trial.

278.   As a further direct and proximate result of Defendants' misappropriation of Genentech's confidential, proprietary, and trade secret information, Defendants have been or will be unjustly enriched in an amount to be proven at trial.

279.   Defendants' misappropriation of Genentech's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.

280.   Genentech has been damaged by Defendants' misappropriation of its confidential, proprietary, and trade secret information, and is entitled to its damages in an amount to be determined at trial, as well as an award of exemplary damages and attorneys' fees.

281.   Because Genentech's remedy at law is inadequate, Genentech is further entitled to preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and other legitimate business interests.

### THIRD CAUSE OF ACTION

**Conspiracy to Misappropriate Trade Secrets**

**(18 U.S.C. § 1836, *et seq.* and Cal. Civ. Code § 3426, *et seq.*)**

**Against All Defendants**

282.     Genentech repeats and incorporates by reference all prior allegations of this Complaint as if fully set forth herein.

283.     As set forth above, Defendant Xanthe Lam misappropriated Genentech's trade secrets for her benefit and the benefit of her co-Defendants.

284.     To the extent any of Xanthe's co-Defendants did not directly misappropriate Genentech's trade secrets, they conspired with Xanthe to commit such wrongful act.

285.     Each Defendant was aware that Xanthe planned to misappropriate Genentech's trade secrets for his or its benefit, agreed with and encouraged this plan, and intended that it be carried out.

286.     To the extent any Defendant did not have advance notice that Xanthe planned to misappropriate Genentech's trade secrets for his or its benefit, each such Defendant joined the conspiracy when it knowingly received Genentech's trade secrets from or through Xanthe.

287.     Xanthe and her co-Defendants, as joint tortfeasors, are jointly and severally liable for the misappropriation of Genentech's trade secrets.

### FOURTH CAUSE OF ACTION

**Breach of Contract – Employee's Proprietary Information and Inventions Agreement**

**Against Defendants Xanthe Lam and James Quach**

288.     Genentech repeats and incorporates by reference all prior allegations of this Complaint as if fully set forth herein.

289.     Xanthe Lam and Genentech entered into an "Employee's Proprietary Information and Inventions Agreement" ("Proprietary Information Agreement") on or about August 19, 1986.

290.     James Quach and Genentech entered into a Proprietary Information Agreement on or about September 12, 1992.

291.     The Proprietary Information Agreement is a valid contract to which Xanthe and

Quach agreed to be bound "[i]n consideration of my employment or continued employment, as the case may be, and the compensation received by me from the Company from time to time." Exs. B & C.

292.   Pursuant to the Proprietary Information Agreement, Xanthe and Quach acknowledged their understanding that "[m]y employment creates a relationship of confidence and trust between me and the Company with respect to any information . . . [a]pplicable to the business of the Company." Exs. B & C. Xanthe and Quach further acknowledged their understanding that:

> The Company possesses and will continue to possess information . . . which information has commercial value in the business in which the Company is engaged. All of the aforementioned information is hereinafter called "Proprietary Information." By way of illustration, but not limitation, Proprietary Information includes trade secrets, processes, formulas, data and know-how, improvements, inventions, techniques, marketing plans, strategies, forecasts, and customer lists.

*Id.*

293.   Pursuant to the Proprietary Information Agreement, Xanthe and Quach agreed to (1) at all times, both during and after employment with Genentech, keep Genentech's Proprietary Information confidential; (2) during their employment with Genentech, refrain from engaging in any employment or activity other than for Genentech in any business in which Genentech is or could become engaged; and (3) upon termination of their employment with the company for any reason, return to Genentech all documents and data pertaining to their work with Genentech and not take with them any documents or data containing Proprietary Information.

294.   Genentech has at all times fully performed its obligations under the Proprietary Information Agreement.

295.   As set forth herein, Xanthe breached the Proprietary Information Agreement by disclosing Genentech's Proprietary Information to and/or engaging in concurrent employment or other activity with Genentech competitors Eusol, Mycenax, JHL, APBio, and OBI.

296.   Xanthe concealed these breaches of the Proprietary Information Agreement, and Genentech could not reasonably have discovered Xanthe's secret misconduct until receiving a tip in October 2016 that led to the investigation described above.

297.   As set forth herein, Quach breached the Proprietary Information Agreement by

taking documents and data containing Genentech's Proprietary Information with him following the termination of his employment by Genentech and, on information and belief, disclosing Genentech's Proprietary Information to JHL.

298.    As a direct and proximate result of Xanthe's and Quach's breach of contract, Genentech has suffered irreparable injury and significant damages, in an amount to be proven at trial.

299.    Genentech will continue to be directly and proximately harmed if Xanthe and Quach are not enjoined from further violating the terms of the Proprietary Information Agreement by continuing to possess documents and data pertaining to their work with Genentech and/or continuing to disclose Genentech's Proprietary Information.

300.    Genentech is entitled to damages sufficient to compensate for Xanthe's and Quach's breach.

301.    Because Genentech's remedy at law is inadequate, Genentech is also entitled to preliminary and permanent injunctive relief to prevent irreparable harm to its legitimate business interests.

## FIFTH CAUSE OF ACTION

### Intentional Interference with Contractual Relations

### Against Defendants JHL, Racho Jordanov, Rose Lin, Allen Lam, John Chan, and James Quach

302.    Genentech repeats and incorporates by reference all prior allegations of this Complaint as if fully set forth herein.

303.    As set forth above, Xanthe Lam and Genentech entered into the Proprietary Information Agreement, a valid contract, on or about August 19, 1986.

304.    On information and belief, Defendants JHL, Racho Jordanov, Rose Lin, Allen Lam, John Chan, and James Quach knew that Xanthe was employed by Genentech at all relevant times.

305.    On information and belief, as experienced participants in the biotech industry, JHL, Allen, Chan, and Quach knew that by virtue of Xanthe's employment, she would be

contractually prohibited from engaging in employment, providing consulting services, offering technical assistance, or performing other activities, paid or unpaid, for Genentech's direct competitors.

306.    As former Genentech employees, Allen, Quach, Jordanov, and Lin were all signatories to a standard Proprietary Information Agreement signed by all Genentech employees upon acceptance of employment, and were thus personally familiar with the terms of the Proprietary Information Agreement, Exhibits B & C, and knew that Xanthe Lam was bound by those terms.

307.    Defendant JHL knew of Xanthe's Proprietary Information Agreement through its CEO, Jordanov, and its General Manager, Rose Lin, both of whom were former Genentech employees as well.

308.    JHL, Jordanov, Lin, Allen, Chan, and Quach intentionally interfered with Xanthe's contractual obligations by inducing Xanthe to engage in employment and/or other activity with Genentech competitor JHL, thereby breaching her Proprietary Information Agreement with Genentech.

309.    As set forth above, Xanthe did engage in employment and/or other activity with JHL in violation of the Proprietary Information Agreement, causing damages to Genentech in an amount to be proven at trial.

310.    JHL's, Jordanov's, Lin's, Allen's, Chan's, and Quach's intentional interference with Xanthe's contractual relations with Genentech was willful, malicious, fraudulent, and oppressive.

311.    Genentech has been damaged by Defendants' intentional interference with its contractual relations, and is entitled to damages in an amount to be determined at trial, as well as an award of exemplary damages and attorneys' fees.

## SIXTH CAUSE OF ACTION

### Breach of Duty of Loyalty

### Against Defendant Xanthe Lam

312.    Genentech repeats and incorporates by reference all prior allegations of this

Complaint as if fully set forth herein.

313. Under California law, Xanthe Lam owed Genentech a duty of loyalty while she was an employee of the company.

314. As alleged herein, Xanthe consulted or otherwise worked for or on behalf of Eusol, Mycenax, JHL, APBio, and OBI—all Genentech competitors—for her own personal gain while employed by Genentech. These actions were inimical to the best interests of Genentech.

315. As a direct and proximate result of Xanthe's actions in breach of her duty of loyalty to Genentech, Genentech has suffered significant damages, in an amount to be proven at trial.

316. Genentech is entitled to damages sufficient to compensate for Xanthe's breach. Genentech is further entitled to disgorgement of Xanthe's salary and benefits paid by Genentech during her period of disloyalty, including stock-settled appreciation rights (S-SARS) and restricted stock units (RSUs), as well as disgorgement of all earnings, bonuses or other compensation and benefits she obtained due to her breach.

## SEVENTH CAUSE OF ACTION

### Aiding and Abetting Breach of Duty of Loyalty

**Against Defendants JHL, Racho Jordanov, Rose Lin, Allen Lam, John Chan, and James Quach**

317. Genentech repeats and incorporates by reference all prior allegations of this Complaint as if fully set forth herein.

318. As set forth above, Xanthe Lam owed Genentech a duty of loyalty while she was an employee of the company and breached that duty to Genentech's detriment.

319. On information and belief, Defendants JHL, Racho Jordanov, Rose Lin, Allen Lam, John Chan, and James Quach knew that Xanthe was employed by Genentech at all relevant times.

320. On information and belief, JHL, Jordanov, Lin, Allen, Chan, and Quach knew that it was a breach of Xanthe's duty of loyalty for her to work for Genentech competitors while employed by Genentech.

321. JHL, Jordanov, Lin, Allen, Chan, and Quach provided substantial encouragement

1   and assistance to Xanthe in breaching her duty of loyalty, intended to induce Xanthe to breach her

2   duty of loyalty, and benefitted from Xanthe's breach.

3       322.    As set forth above, Genentech suffered significant damages from Xanthe's breach

4   of her duty of loyalty. JHL's, Jordanov's, Lin's, Allen's, Chan's, and Quach's conduct

5   encouraging and assisting Xanthe's breach was a substantial factor in causing harm to Genentech.

6       323.    JHL's, Jordanov's, Lin's, Allen's, Chan's, and Quach's aiding and abetting

7   Xanthe's breach of her duty of loyalty was willful, malicious, fraudulent, and oppressive.

8       324.    Genentech has been damaged by Defendants' aiding and abetting Xanthe's breach

9   of her duty of loyalty, and is entitled to damages in an amount to be determined at trial,

10  disgorgement of JHL's, Jordanov's, Lin's, Allen's, Chan's, and Quach's earnings, profits,

11  compensation and other benefits obtained due to Xanthe's breach, and an award of exemplary

12  damages and attorneys' fees.

## EIGHTH CAUSE OF ACTION

### Violation of the Computer Fraud and Abuse Act

### (18 U.S.C. § 1030)

### Against James Quach and JHL

17      325.    Genentech repeats and incorporates by reference all prior allegations of this

18  Complaint as if fully set forth herein.

19      326.    On or about July 9, 2017, July 16, 2017, and July 26, 2017, Defendant James

20  Quach accessed Genentech's computer network using Defendant Xanthe Lam's credentials for

21  the purpose of downloading and misappropriating files containing Genentech's confidential,

22  proprietary, or trade secret information for his own and JHL's benefit.

23      327.    Quach did in fact download and save files to a personal hard drive, including a

24  collection of documents containing Genentech's confidential, proprietary, and trade secret

25  information. On information and belief, Quach then took the misappropriated data to JHL and

26  used it for JHL's benefit.

27      328.    Quach was acting as JHL's agent when he accessed Genentech's computer

28  network and misappropriated Genentech's data.

329.   Genentech's computer network is a "protected computer" for purposes of the Computer Fraud and Abuse Act because it is connected to the internet and is used in or affects interstate commerce.

330.   Upon Quach's involuntary termination as a Genentech employee in April 2017, Genentech expressly revoked his authorization to access Genentech's computer network, and Quach has remained unauthorized to access Genentech's computer network since that time. Quach thus accessed Genentech's computer network in or around July 2017 without authorization.

331.   By virtue of his 17 years of employment at Genentech, Quach knew that non-employees are not authorized to access Genentech's computer network, and that Xanthe was not empowered to authorize his access.

332.   Xanthe was prohibited by Genentech policies from using her credentials to enable access to Genentech's computer network by non-employees.

333.   Quach accessed Genentech's computer network with an intent to defraud because he intended to misappropriate Genentech's confidential, proprietary, and trade secret information for his own benefit and the benefit of JHL.

334.   By accessing Genentech's computer network, Quach furthered his intended fraud by wrongfully obtaining valuable property belonging to Genentech.

335.   As a direct and proximate result of Quach's unauthorized access to its computer network, Genentech suffered a loss in 2017 in excess of $5,000.

## NINTH CAUSE OF ACTION

### Conspiracy to Violate the Computer Fraud and Abuse Act

### (18 U.S.C. § 1030)

### Against Xanthe Lam, James Quach, and JHL

336.   Genentech repeats and incorporates by reference all prior allegations of this Complaint as if fully set forth herein.

337.   As set forth above, on or about July 9, 2017, July 16, 2017, and July 26, 2017, Defendant James Quach accessed Genentech's computer network without authorization using

1    Defendant Xanthe Lam's credentials.

2         338.    Quach and Xanthe entered into an agreement to violate the Computer Fraud and

3    Abuse Act ("CFAA") when they arranged for Quach to use Xanthe's credentials to gain

4    unauthorized access to Genentech's computer network for the purpose of downloading and

5    misappropriating files containing Genentech's confidential, proprietary, or trade secret

6    information for Quach's and JHL's benefit.

7         339.    Xanthe was aware that Quach planned to violate the CFAA by using her

8    credentials to gain unauthorized access to Genentech's computer network for his own and JHL's

9    benefit, and she agreed with this wrongful act and intended that it be committed.

10        340.    If Quach was not acting as JHL's agent when he violated CFAA, JHL joined the

11   conspiracy when it knowingly received documents from Quach that were misappropriated

12   through his violation of the CFAA or when it knowingly benefitted from the information

13   contained therein through Quach's employment.

14        341.    Xanthe and JHL, as joint tortfeasors with Quach, are jointly and severally liable

15   for Quach's violation of the CFAA.

16                          **TENTH CAUSE OF ACTION**

17          **Violation of the Computer Data Access and Fraud Act ("CDAFA")**

18                           **(Cal. Pen. Code § 502)**

19                      **Against Xanthe Lam, James Quach, and JHL**

20        342.    Genentech repeats and incorporates by reference all prior allegations of this

21   Complaint as if fully set forth herein.

22        343.    Genentech's computer network is a "computer network" for purposes of the

23   CDAFA because it "provides communications between one or more computer systems and

24   input/output devices, including, but not limited to, display terminals, remote systems, mobile

25   devices, and printers connected by telecommunication facilities."  Cal. Penal Code § 501(a)(2).

26        344.    As set forth above, on or about July 9, 2017, July 16, 2017, and July 26, 2017,

27   Defendant James Quach knowingly accessed Genentech's computer network using Defendant

28   Xanthe Lam's credentials for the purpose of downloading and misappropriating files containing

1  Genentech's confidential, proprietary, or trade secret information for his own and JHL's benefit.

2  Accordingly, he "[k]nowingly accesse[d] and without permission . . . use[d]" Genentech's

3  "computer network in order to . . . wrongfully control or obtain . . . data." Cal. Pen. Code §

4  502(c)(1).

5      345.    Knowing that Quach was no longer a Genentech employee with access to

6  Genentech's computer network, Xanthe nonetheless "[k]nowingly and without permission

7  provide[d] or assist[ed] in providing a means of accessing a . . . computer network" in violation of

8  the CDAFA. Cal. Penal Code § 502(c)(6).

9      346.    Quach did in fact download and save files to a personal hard drive, including a

10  collection of documents containing Genentech's confidential, proprietary, and trade secret

11  information. Accordingly, he "[k]nowingly accesse[d] and without permission t[ook], copie[d]"

12  and "ma[de] use of . . . data from a . . . computer network," in violation of the CDAFA. Cal.

13  Penal Code § 502(c)(2).

14      347.    Quach was acting as JHL's agent when he accessed Genentech's computer

15  network and misappropriated Genentech's data.

16      348.    On information and belief, Quach then took the misappropriated data to JHL and

17  used it for JHL's benefit.

18      349.    Upon Quach's involuntary termination as a Genentech employee in April 2017,

19  Genentech expressly revoked his authorization to access Genentech's computer network, and

20  Quach has remained unauthorized to access Genentech's computer network since that time.

21  Quach thus accessed Genentech's computer network in or around July 2017 without permission.

22      350.    By virtue of his 17 years of employment at Genentech, Quach knew that non-

23  employees are not authorized to access Genentech's computer network, and that Xanthe was not

24  empowered to authorize his access.

25      351.    Xanthe was prohibited by Genentech policies from using her credentials to enable

26  access to Genentech's computer network by non-employees.

27      352.    When she allowed Quach to access Genentech's computer network using her

28  credentials, Xanthe knew that Quach was or would soon be working for JHL.

353.   Quach knowingly accessed Genentech's computer network with an intent to defraud because he intended to misappropriate Genentech's confidential, proprietary, and trade secret information for his own benefit and the benefit of JHL.

354.   By accessing Genentech's computer network, Quach furthered his intended fraud by wrongfully obtaining valuable property belonging to Genentech.  Xanthe, Quach, and JHL acted with oppression, fraud, and malice in violating the CDAFA as alleged and described herein.

355.   As the owner of the computer network at issue, Genentech is entitled to compensatory damages, injunctive relief, reasonable attorneys' fees, and punitive or exemplary damages.  Cal. Penal Code § 502(e)(1),(2),(4).

## PRAYER FOR RELIEF

WHEREFORE, Genentech respectfully requests the following relief:

A.   Judgment in favor of Genentech and against Defendants on each cause of action alleged herein;

B.   All damages caused by Defendants' unlawful actions in an amount to be determined at trial, such damages to include actual loss and unjust enrichment;

C.   Exemplary and punitive damages as provided by law;

D.   Disgorgement of all proceeds Defendants have received from the misappropriation of Genentech's confidential, proprietary, and/or trade secret information;

E.   Awarding Genentech pre-judgment and post-judgment interest;

F.   Attorneys' fees, costs, and expenses incurred by Genentech in investigating this misconduct and litigating this action;

G.   Preliminary and permanent injunctive relief pursuant to which Defendants, and each of them, and their employees or representatives, and all persons acting in concert or participating with them are ordered, enjoined, or restrained, directly or indirectly, by any means whatsoever, as follows:

   a.   From disclosing or using Genentech's confidential, proprietary, and trade secret information;

   b.   From making, testing, using, promoting, offering to sell, marketing,

71

commercializing, or selling biologics, therapeutics, drugs, and/or products of any kind that utilize, embody, or were developed, in whole or in part, with the benefit or use of any of Genentech's confidential, proprietary, and/or trade secret information;

c.  From utilizing any processes or methods that are derived from, contain, or embody, in whole or in part, any of Genentech's confidential, proprietary, and/or trade secret information;

d.  From submitting to or filing with any regulatory body any documents or other materials (in paper, electronic, or any other form, including, for example, cell lines, assays, or drug substances) that are derived from, contain, or embody, in whole or in part, any of Genentech's confidential, proprietary, and/or trade secret information;

e.  Immediately to preserve and return to Genentech (i) all copies of all Genentech documents and information, including without limitation any trade secret and other confidential or proprietary information acquired from Genentech; and (ii) all copies of all materials (in paper, electronic, or any other form, including, for example, cell lines, assays, or drug substances) containing any, or derived from any, Genentech information, trade secrets, or other confidential or proprietary information; and

f.  To identify each individual and entity to whom or to which Defendants and any of them, and their employees or representatives, and all persons acting in concert or participating with them, disclosed (i) any Genentech documents or other materials (in paper, electronic, or any other form, including, for example, cell lines, assays, or drug substances) or (ii) any of Genentech's confidential, proprietary, and/or trade secret information; and

g.  To turn over to the Court any proceeds Defendants have received from the misappropriation of Genentech's confidential, proprietary, and/or trade secret information, which proceeds would be held in constructive trust until the

conclusion of this litigation;

H.     Granting Genentech such other and further relief as this Court deems just and proper.

## JURY DEMAND

Genentech hereby demands a jury trial as to all issues triable before a jury.

Dated:  October 29, 2018                                KEKER, VAN NEST & PETERS LLP


                                               By:    /s/ Elliot R. Peters
                                                      ELLIOT R. PETERS

                                                      Attorneys for Plaintiff
                                                      Genentech, Inc.

COMPLAINT
Case No.