UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> XANTHE LAM, ALLEN LAM, and JOHN CHAN, <br><br> Defendants. | No. CR 18-0527 WHA <br><br> **ORDER RE MOTION TO SUPPRESS** |

## INTRODUCTION

In this criminal action for theft of trade secrets, defendants move to suppress evidence seized as a result of two search warrants. For the following reasons, the motion is **DENIED**.

## STATEMENT OF FINDINGS

A previous order has stated the facts of this case (Dkt. No. 106). Briefly, Genentech, Inc. is a biotechnology corporation in San Francisco that manufactures and commercializes biopharmaceuticals for various medical conditions. JHL Biotech, Inc. is a biopharmaceutical company in Taiwan that developed biosimilars of certain Genentech biopharmaceuticals.

Defendant Xanthe Lam was a principal scientist at Genentech beginning in 1986. She allegedly, among other things, facilitated the transfer of Genentech trade secrets to JHL.

Xanthe's husband, Allen Lam, was employed at Genentech in Quality Control from 1989 to 1998. He allegedly also facilitated the transfer of these trade secrets in exchange for fees and founder stock options at JHL. From 2014 to 2016, Xanthe allegedly provided confidential Genentech documents to defendant John Chan, a JHL employee and family friend.

### 1. JUNE GMAIL WARRANT.

In June 2017, FBI Agent Frank Reid applied to Magistrate Judge Howard Lloyd for a search warrant. The warrant authorized, among other things, the search and seizure of emails, chat sessions, transaction information, and business records of the following Gmail accounts: mlsheung2@gmail.com and allenlam2@gmail.com. The warrant also authorized law enforcement officers to copy the fruits of these email addresses, including information pertaining to communications regarding Genentech and JHL.

The 38-page affidavit started out by describing affiant Agent Reid's background and experience in investigations involving computer-related crimes. It went on to describe the parties allegedly involved in the scheme (the Lams, John Chan, Genentech, JHL, and Roche) as well as the landscape of developing biosimilars for the biopharmaceuticals in question, specifically the benefits of access to particular confidential data. The affidavit also provided details about the defendants' employment history. In particular, Xanthe had been employed at Genentech since April 1986, and then worked for JHL from 2013 to the summer of 2015. It also stated that Allen worked at Genentech from 1989 to 1998, consulted for JHL from at least 2013 to 2014, and received JHL stock options in 2012. It further stated that "dating back to 2009. . . LAM [Xanthe] has maintained robust and ongoing consulting relationships with at least four GENENTECH competitors . . . : EUSOL, MYCENAX, JHL, and APBio.

The affidavit then established Xanthe's connections to Genentech and JHL. For example, the affidavit noted that Xanthe named specific folders on her Genentech computer as Genentech product names with "JHL" appended to the end (*e.g.* Rituxan_JHL), and that each of these folders "contained a mixture of GENENTECH confidential documents alongside internal JHL documents." She also sent a confidential Genentech technical report to Allen's personal email address, asking him to make a hard copy and not "show it to others." The

affidavit then further tied Xanthe's communications regarding JHL to her personal email address, which she had used on her Genentech laptop.  In particular, it cited to Google Chrome logs in which Xanthe downloaded certain JHL documents and communicated with JHL about biosimilars for Genentech drugs.

### 2. SEPTEMBER HOUSE WARRANT.

After receiving materials from the search of the above-mentioned accounts, Agent Reid applied to Chief Magistrate Judge Joseph Spero for a search warrant for the Lams' home in September 2017.  The house warrant began by stating that the items to be seized are "any digital devices, for evidence, fruits or instrumentalities of violations of Title 18, United States Code, Section 1832 (Theft of Trade Secrets)."  It then went on break down the evidence into 11 broad categories.

The affidavit accompanying the search warrant for the Lams' home provided information similar to the affidavit for the Gmail warrant and more.  In particular, it added that beginning in May 2012, JHL representatives contacted Xanthe with questions related to formulations, testing procedures, and product development.  It also provided excerpts of email conversations between the Lams and Genentech's competitors (*i.e.* Mycenax and Eusol) regarding pharmacological research and payments for completed work from their Gmail accounts.

Based on these allegations and evidence obtained as a result of the above-mentioned search warrants, defendants Xanthe, Allen, and Chan are charged with violating 18 U.S.C. § 1832(a)(5) – Conspiracy to Commit Theft of Trade Secrets (Count 1); U.S.C. §§ 1832(a)(1), (2), (3) & 2 – Theft of Trade Secrets; Aiding and Abetting (Counts 2 to 27).  Defendant Xanthe is also charged with violating 18 U.S.C. § 1832(a)(5) – Conspiracy to Commit Theft of Trade Secrets (Count 28); 18 U.S.C. §§ 1832(a)(1), (2), (3) & 2 – Theft of Trade Secrets; Aiding and Abetting (Counts 29 to 32); 18 U.S.C. § 1030(b) – Conspiracy to Commit Computer Fraud and Abuse (Count 33); and with 18 U.S.C. §§ 1030(a)(2)(C), (c)(2)(B)(i), (ii), (iii) & 2 – Computer Fraud and Abuse; Aiding and Abetting (Counts 34 to 36).

Defendants Xanthe and Allen now move to suppress all evidence obtained by the government as a result of the two above-mentioned search warrants.  Defendant John Chan has

3

moved to join the Lams' motion. The government opposes. This order follows full briefing and oral argument.

**ANALYSIS**

Motions to suppress are reviewed de novo, with significant deference afforded to the magistrate judge's finding of probable cause. Specifically, the court need only find "under the totality of the circumstances the magistrate had a substantial basis for concluding that probable cause existed" for a search warrant to be valid. *United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir. 1986). In demonstrating probable cause, a search warrant affidavit must be sufficiently particular in describing the place to be searched and the person or things to be seized. Generally, the particularity of the warrant must be assessed without reference to the affidavit. The warrant, may however, be construed with reference to the affidavit for purposes of satisfying the particularity requirement if (1) the affidavit accompanies the warrant, and (2) the warrant uses suitable words of reference which incorporate the affidavit therein." *United States v. Hillyard*, 677 F.2d 1336, 1340 (9th Cir. 1982) (citations omitted).

1.  **PROBABLE CAUSE.**

Defendants argue the Gmail search warrant was not supported by probable cause. Defendants specifically contend the warrant failed to establish a nexus between the Lams' personal Gmail accounts and stolen trade secrets. Under a totality of the circumstances analysis, we must uphold a warrant if the affidavit presented a fair probability for the issuing magistrate to find that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 214 (1983). The affidavit must additionally establish "a reasonable nexus between the activities supporting probable cause and the locations to be searched." *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991). In this case, it means that the warrant need not explicitly establish the existence of trade secrets in the Gmail accounts, only probable cause that trade secrets may have been stolen.

Defendants correctly contend there is nothing in the affidavit that explicitly indicates they downloaded and sent Genentech trade secrets to JHL with their personal emails, only that Xanthe downloaded confidential documents, violating Genentech's Code of Conduct.

4

Defendants also correctly contend that based on the *Nosal* cases, merely violating a company's Code of Conduct would be insufficient on its own to constitute sufficient probable cause. What defendants miss, however, is that the implication from the above-mentioned background information in the affidavit as to defendants' actions involving their personal emails, their employment history, and the nature of the biosimilars industry presented a fair probability for a magistrate judge to infer that Genentech trade secrets were stolen, and could be found on the Lams' personal Gmail accounts.

### 2. BREADTH.

Defendants contend that both the Gmail and home search warrants were overbroad. The Gmail search warrant allowed for the search and seizure of information from January 1, 2012, through January 6, 2017, while the home search warrant authorized the search and seizure of all records from January 1, 2009, and on.

Both sides have cited to one of our previous orders in *United States v. Cerna*, in which we found insufficient probable cause to allow for the seizure of cell phone records nine months preceding a homicide, but found sufficient probable cause to allow for the seizure of cell phone records from approximately two months preceding the homicide to approximately two months subsequent to the homicide. 2010 U.S. Dist. LEXIS 145991 (N.D. Cal. Sept. 22, 2010).

*Cerna* allowed seizure of cell phone records from up to two months following the homicide because it contemplated such records could have contained discussions about the homicide or attempts to cover it up. It also allowed seizure of cell phone records up to two months prior to the homicide because the affidavit had discussed brewing tensions among defendants' gang and victim's rival group during that time. It, however, found a lack of probable cause to search records prior to that time because the affidavit failed to proffer any basis that the records would contain any evidence defendants participated in a racketeering conspiracy or homicide.

#### A. JUNE GMAIL WARRANT.

Beyond the generalized statements regarding defendants' employment history, the affidavit provided specific examples of defendants' suspicious conduct prior to their

5

employment at JHL in 2013. The affidavit stated that in 2009, Xanthe sent Allen's resume to APBio, and APBio responded, asking to discuss "perhaps through your personal email." It next stated that in 2010, Xanthe used her Genentech email address to send an email to one of Allen's personal email addresses with "GENTENCH CONFIDENTIAL – DO NOT FORWARD" in the first line of the email body. The affidavit first noted the use of the Gmail accounts in October 2013, when Xanthe sent JHL documents to herself from her Genentech email to her Gmail.

Defendants contend that the date range should have been limited since the alleged trade secret theft occurred between December 2013 and the summer of 2015 when Xanthe and Allen were working for JHL. True, the affidavit stated that Xanthe had worked for JHL from 2013 and that Allen worked for JHL since at least 2013. It also, however, stated that Allen had received JHL stock options since at least 2012, indicating at least some professional relationship with the company prior to 2013. Combined with the fact that Xanthe had sent allegedly confidential Genentech information to one of Allen's personal email addresses in 2010 (when he wasn't working for Genentech), the affidavit provided sufficient probable cause to allow for the search of records from at least January 1, 2012.

As to defendants' conduct after 2015, the affidavit noted Genentech launched an investigation in October 2016 after receiving an anonymous tip that Xanthe was listed on an APBio presentation as a "consultant." The affidavit also stated that Xanthe had been in constant contact via Skype with Chan, who she had helped secure a job at JHL, between May 15, 2014, and November 12, 2016. The two were in contact up until April 2017 (when Agent Reid wrote the affidavit) when Chan emailed Xanthe regarding his interest in obtaining employment at Nektar or Lonza.

Defendants point out evidentiary weaknesses in the affidavit, specifically that Xanthe's employment at APBio was only supported by an anonymous tip. It is true that some of the allegations regarding the Lams' employment history after 2015 is weak, but the affidavit importantly noted Xanthe and Chan's continuing relationship after 2015. Chan, someone Xanthe helped secure employment at JHL, and who received confidential Genentech materials

from Xanthe and Allen, had been in constant contact with Xanthe even after she had left JHL. Given the history of defendants communicating with each other regarding confidential Genentech documents as well as their continued relationship up until at least January 2017, the affidavit provided sufficient probable cause to allow for the search of records up until at least January 6, 2017.

### B.   SEPTEMBER HOUSE WARRANT.

#### (i)   Date Range.

Without any further detail, the mere allegation that the Lams maintained "consulting relationships" with competitors beginning in 2009 was not sufficient to allow the seizure of records dating back to when the alleged relationships began. There should be something in the affidavit that provides a fair probability that defendants were engaging in trade secret theft related to those companies during the date range requested by the warrant, such as sending confidential information. Regardless of when either of the Lams were employed with Genentech competitors, the earliest mention of their suspicious conduct in the affidavit was an email exchange dated August 11, 2009, in which Xanthe forwarded Allen's resume to APBio and APBio responded, "Let me know if you would like to go over the idea you have in more details, perhaps through your personal email?" This email could be interpreted innocuously, but affording deference to Chief Magistrate Judge Spero, this order finds probable cause was shown to allow searches of records beginning on that date. There is, however, no probable cause to search any documents preceding that date. Unlike in *Cerna,* where the affidavit at least stated that tensions had been brewing prior to the homicide, there is no indication in the affidavit that could lead to an inference that defendants had engaged in trade secret theft prior to August 11, 2009.

For the reasons stated above, the affidavit did, however, provided sufficient probable cause to allow for the search of records up until the execution of the search warrant in September 2017.

The records preceding August 11, 2009, must be suppressed unless the government establishes a warrant exception for the seizure of these record, or otherwise severed.

7

Generally, evidence gathered as a result of an unlawful search is still admissible if an executing officer relied in good faith on a neutral magistrate judge's determination of the validity of a warrant. *United States v. Leon*, 468 U.S. 897, 899 (1984).

Here, the exclusionary rule applies. As stated above, other than the August 2009 email, the 24-page affidavit also noted the consulting relationship defendants allegedly had with competitors dating back to 2009. In the context of the pharmaceutics industry (which the affidavit describes) where the knowledge of processes from those who originally developed biologics can be invaluable to competitors who are developing biosimilars, it was not objectively unreasonable to rely on the date range provided in the affidavit. At a minimum, Allen, Xanthe's husband, had some relationship with Genentech competitors in 2009 while Xanthe was working at Genentech. This warrant was not so overbroad or so lacking in probable cause where it would have been objectively unreasonable to believe that evidence from that time period could be seized.

### *(ii)    Devices seized.*

One of the categories of items that the house warrant allowed for the seizure of was: "[a]ny digital device used to facilitate the above-listed violation and forensic copies thereof" followed by a further detailed breakdown of the type of information to be seized, such as the times the device was used, applications, and IP addresses. Defendants take issue with the breadth in this section of the warrant because it authorized the search and seizure of *any* digital storage device containing material related to the biotech industry, not just Xanthe's Genentech-issued laptop or the servers that stored their emails.

True, the only means the affidavit explicitly mentioned as being used to store confidential documents is Xanthe's Genentech-issued laptop and implicitly, defendants' personal email servers that were used to allegedly send the confidential documents. The affidavit also, however, highlighted events regarding consulting agreements with Genentech competitors that occurred while Xanthe was not working for Genentech as well as communications between the defendants in which other devices were used. For example, in July 2010, Allen wrote an email to Xanthe regarding Eusol in which he said, "I am sending this thru your g-mail using my PC."

1   Later in March 2013, Allen sent Xanthe an email noting that he "submitted the invoice for the

2   plane ticket and Her2IEC to Pearl" a Mycenax employee, implying a device other than

3   Xanthe's Genentech computer was used to create the invoice. There thus existed a fair

4   probability that defendants used devices other than Genentech laptops and email servers to

5   allegedly steal trade secrets. It is also important to note that the warrant here still limited the

6   items to be seized to those that, for example, related to Genentech, its competitors, and

7   pharmaceutical consulting. Although the breadth of this warrant could have potentially

8   allowed the seizure of all storage devices in the household, the limitations meant that those

9   devices truly unrelated to the crime (*e.g.* containing solely personal information or solely

10  records of crimes completely unrelated to the theft of trade secrets) could not be seized. The

11  warrant was thus not overbroad in this regard.

### 3. PARTICULARITY.

In evaluating a warrant's particularity, our court of appeals has focused on the following factors:

> (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.

*United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986) (citations omitted).

#### A. JUNE GMAIL WARRANT.

Defendants contend the Gmail search warrant lacked particularity by authorizing the search and seizure of all emails and transactional information related to Genentech and the biopharmaceutical industry, as well as those that would show who was using the email accounts, thereby encompassing all of the Lams' electronic communications (including personal communications) instead of just those related to the theft of trade secrets.

The affidavit here allowed law enforcement to copy the following:

> a.  Any communications with any persons or entities regarding Genentch, JHL Biotech Inc, Eusol Inc, Mycenax, AP Biosciences

United States District Court
Northern District of California

|  |  |  |
|---|---|---|
| b. | | Any communications with any persons or entities regarding consulting services; |
| c. | | Any communications with any person or entities regarding the discussion of biopharmaceutical or biosimilar medicines; |
| d. | | Records relating to who created, used, or communicated with the account or; |
| e. | | Identifier, including records about their identities or whereabouts. |

Defendants cite to *United States v. Kow* to support their argument that the affidavit could have specified that the only emails to be seized were those relating to, discussing, or having attached to them certain information or files concerning Genentech's development of specific drugs, or even types of Genentech files. 58 F.3d 423, 426 (9th Cir. 1995). *Kow* found a warrant that allowed for the seizure of, for example, all financial statements and computer equipment, insufficiently particular because the warrant did not specify the suspected criminal conduct and only made "vague references to fraudulent transactions." *Id.* at 427. Unlike the affidavit in *Kow*, however, the affidavit here made specific references to defendants' alleged consulting relationships with Genentech's competitors and that they may have provided Genentech's confidential information to those competitors. For example, the affidavit referenced an email exchange between Allen and Xanthe where he stated, "I am sending this thru your g-mail using my PC. Your account works but is not working on your PC. Judy has a problem with the Agilent HPLC. Get some help from Victor to troubleshoot." Xanthe then responded, "I think the problem is not the salt. It is the protein ppt." Limiting the warrant to only emails relating to specific Genentech drugs or files as defendants suggest would be too narrow, as it would not capture the alleged possible employment or payment arrangements defendants made with competitors. It also would not capture all information defendants allegedly provided to these competitors, such as the above email exchange where neither a Genentech file nor Genentech drug is explicitly named. The warrant was thus sufficiently particular in this regard.

### B. SEPTEMBER HOUSE WARRANT.

Defendants take issue with the particularity of the house warrant on the ground that it did not describe what constitutes a trade secret, thereby providing insufficient guidance for searching agents as to what records to actually seize. The government here was not in a position to determine what specifically constituted a trade secret at that time. Only the victim companies would know, especially during the investigatory stages, what constituted a trade secret. The warrant here set out objective standards narrowing the items to be seized (*e.g.* information involving Genentech, its competitors, and pharmaceutics) to the extent it could in light of the information that was available to it at the time. The warrant was thus sufficiently particular in this regard.

Additionally, to the extent defendants contend the evidence from the house search should be suppressed because the searching agents or Xanthe were not provided with the warrant, Agent Reid has submitted a declaration stating otherwise. Specifically, he stated he reviewed the affidavit during a meeting with agents prior to executing warrant. The declaration also states that he showed Xanthe the warrant during the search and that she provided him with the passwords for her email accounts, iPhone, and the password for her iPhone and for her Genentech-issued laptop. An FBI Form 302 also states that a copy of the warrant and FBI Form 597 were left with Xanthe after the search.

### 4. MOTION FOR JOINDER BY JOHN CHAN.

Defendant John Chan has moved to join Xanthe and Allen's motion to suppress emails seized from the Lams' email accounts and laptops. Defendant argues our court of appeals has not conclusively established "that the sender of an email loses any reasonable expectation of privacy after the email has reached its recipient." Our court of appeals in *United States v. Mohamud,* which defendant cited to, has compared emails to letters and noted that there is at least a diminished privacy interest in communications that have been received by a recipient. 843 F.3d 420, 443 (9th Cir. 2016). Defendant has failed to cite any compelling case law as to why the opposite should apply, specifically, why a sender should have standing to challenge

11

the search of emails received (and read) in possession of the recipient.  Accordingly, the motion for joinder is **DENIED**.

**IT IS SO ORDERED.**

Dated:  July 29, 2020.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE